**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-50881.

Jennell L. BRANSON, Plaintiff-Appellant,

v.

GREYHOUND LINES, INC., AMALGAMATED COUNCIL RETIREMENT AND DISABILITY PLAN; Greyhound Lines, Inc., Defendants-Appellees.

Oct. 30, 1997.

Appeals from the United States District Court for the Western District of Texas.

Before JONES, EMILIO M. GARZA and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Jennell L. Branson appeals from the district court's order dismissing his claims against Greyhound Lines, Inc. ("Greyhound" or "GLI") and Greyhound Lines, Inc., Amalgamated Council Retirement and Disability Plan (the "Plan"). The district court held as a matter of law that Branson's breach of contract claim against Greyhound was preempted by section 8 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, and section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. We reverse the district court's preemption ruling and remand for action consistent with this opinion.

The district court further ruled that the Plan Trustees did not abuse their discretion under the Employees' Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), by rejecting Branson's claim for additional seniority credit. We affirm.

1

Branson began working for Greyhound in May 1977 and remained an employee of the company until July 1987, when he resigned to take another job. At the time of Branson's voluntary termination, he was covered by the 1987 collective bargaining agreement ("1987 CBA"), negotiated between Greyhound and the Amalgamated Transit Union (the "Union"). Branson's 10.18 years of service entitled him to certain vested, non-forfeitable pension rights under the Plan, which continues to exist as a legal entity separate and apart from Greyhound and the Union. Branson later returned to work for Greyhound as a replacement employee in April 1990, about a month into a bitter strike.

By the time Branson returned to work for Greyhound, the most recent collective bargaining agreement (the 1987 CBA) had expired, and negotiations toward a new collective bargaining agreement were proceeding. Greyhound also had recently introduced a new term in its negotiations with the Union, essentially designed to encourage experienced drivers to cross the picket line. Greyhound labeled this new term "Experience Based Seniority" or "EBS", and it promised Greyhound seniority credit for any past commercial driving experience. Greyhound informed the Union that it would not abandon this program under any circumstances and began implementing EBS without further negotiations. Shortly thereafter, the Union filed an unfair labor charge with the National Labor Relations Board ("NLRB" or "Board") based on the implementation of EBS.

Following Branson's return to work, he filled out a standard

form by which he requested seniority credit not only for his prior work with Greyhound, but also for driving experience gained from other firms. Because Branson had worked only part-time for these other companies, however, Greyhound granted Branson credit only for his prior Greyhound service.

The grants of EBS "super-seniority" to replacement workers and returning strikers became a major issue in the continuing negotiations between Greyhound and the Union. Even when Greyhound and the Union at last succeeded in signing a new collective bargaining agreement ("1993 CBA"), they inserted a provision leaving the resolution of EBS to the NLRB. The Board later found EBS to be an unfair labor practice and ordered Greyhound to "eliminate all effects of EBS by all appropriate means." Greyhound subsequently began an EBS "buy-out" program, whereby the Company offered cash payments to those employees that had earned EBS in exchange for their signing a standard waiver form.

Branson refused to sign the waiver, insisting that he wanted his additional seniority credit rather than the cash buy-out. Thereafter, Branson brought suit against the Plan in federal court, seeking declaratory relief setting forth his rights under the Plan as provided in ERISA, 29 U.S.C. § 1132(a)(1)(B). Because Branson had not submitted his claim to the Plan Trustees before filing suit, the trial court granted a joint request to modify the scheduling order to permit exhaustion. The district court held the cause in abeyance while Branson exhausted his administrative remedies. The Plan Trustees subsequently held that Branson could

not accumulate additional seniority credit under the Plan beyond his already vested 10.18 years. In the meantime, Branson amended his complaint to include a breach of contract claim against Greyhound based on the alleged promise of seniority.

Branson then tried his case to the district court. At the close of Branson's presentation of evidence, the district court dismissed Branson's breach of contract claim against Greyhound on preemption grounds. The bench trial continued with respect to the Plan. Following the trial, the district court ruled in favor of the Plan, finding that the Trustees did not abuse their discretion in interpreting the Plan to deny Branson additional seniority credit after his termination in 1987. Branson's timely appeal followed.

## II

At the close of Branson's presentation of evidence, the district court granted judgment as a matter of law in favor of Greyhound on the grounds that both the NLRA and the LMRA preempted Branson's breach of contract claim. Branson timely appealed the district court's order on both grounds.[1] We review *de novo* the district court's rulings on preemption. *Baker v. Farmers Elec. Coop., Inc.,* 34 F.3d 274, 278 (5th Cir.1994).

## A

In order to preserve the primary jurisdiction of the NLRB, the NLRA requires that courts not regulate activities "when it is

---

[1]Because we reverse the district court's judgment as to the breach of contract claim against Greyhound, we do not address Branson's claim that the district court erred in granting judgment for Greyhound without adequate notice and without making findings of fact.

clear or may fairly be assumed that [such] activities ... are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959); *accord Belknap, Inc. v. Hale,* 463 U.S. 491, 498, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983); *Windfield v. Groen Div., Dover Corp.,* 890 F.2d 764, 767 (5th Cir.1989). Here, Branson seeks to recover for Greyhound's alleged breach of a promise to restore Branson's previously acquired seniority.

The first prong of *Garmon* preemption requires us to decide whether Branson bases his claim on an activity "protected by section 7" of the NLRA. *Garmon,* 359 U.S. at 244, 79 S.Ct. at 779. Section 7 protects the rights of *employees* to organize, strike, and collectively bargain. 29 U.S.C. § 157. Branson's claim, however, relies on his *employer's* alleged breach of contract. Because the employer's alleged breach of contract does not constitute "activity protected by section 7," the first prong of *Garmon* preemption does not apply.

The second prong of *Garmon* preemption requires us to decide whether Branson's claim involves an activity actually or arguably forbidden under section 8 of the NLRA, which prohibits employers from engaging in unfair labor practices. *Garmon,* 359 U.S. at 244, 79 S.Ct. at 779, 29 U.S.C. § 158. Branson argues that his claim arises solely under an individual promise, unrelated to GLI's implementation of EBS, and therefore involves no terms of employment arguably regulated by section 8. Whether Branson's

5

seniority is or is not EBS, however, does not prove dispositive. Certainly if Branson's claims do not involve the EBS program, no colorable argument exists for NLRB jurisdiction. *See Belknap,* 463 U.S. at 512, 103 S.Ct. at 3184 (holding that federal law does not preempt replacement employees from suing in state court for an employer's breach of individual promises of permanent employment).

Yet our holding of no preemption remains the same even if Branson's claims do involve EBS. The Supreme Court said as much in *Belknap,* where individual replacement employees succeeded in maintaining their state law breach of contract claims against a company which promised them permanent employment but then fired them to make room for returning strikers. 463 U.S. at 495-497, 103 S.Ct. at 3175-3177. There the Court explicitly rejected the employer's contention that the employees' breach of contract suit was preempted "because it related to ... conduct that was part and a parcel of an arguable unfair labor practice." *Id.* at 510, 103 S.Ct. at 3183. Recognizing that "whether the strike was an unfair labor practice strike and whether the offer to replacements was the kind of offer forbidden during such a dispute were matters for the Board," the Court nevertheless noted that in making these determinations, "the Board would be concerned with the impact on strikers not with whether the employer deceived replacements." *Id.* Thus, the state law causes of action were not preempted by the NLRA because they were "of no more than peripheral concern to the Board and the federal law ... while [the state] surely [had] a substantial interest in protecting its citizens from

6

misrepresentations that have caused them grievous harm." *Id.* at 511, 103 S.Ct. at 3183.

GLI seeks to distinguish *Belknap* on the grounds that "*Belknap* did not involve a breach of contract claim based on a term of employment concerning a mandatory subject of bargaining (seniority) unilaterally implemented by an employer upon an impasse in bargaining negotiations." As an initial matter, we note that Greyhound has failed to demonstrate whether impasse in fact occurred before the implementation of EBS, a finding necessary to complete Greyhound's alleged distinction. More fundamentally, however, *Belknap* indeed did involve a term of employment (whether the position was permanent or temporary) concerning a mandatory subject of bargaining (reinstatement of strikers) unilaterally implemented by an employer upon an impasse in bargaining negotiations. *See Belknap,* 463 U.S. at 493-496, 103 S.Ct. at 3174-3176.

GLI more correctly observes that *Belknap* did not involve either an NLRB unfair labor practice finding or a specific order issued by the NLRB because the parties settled their differences before such a decision could issue. Nevertheless, *Belknap* addressed that very argument by noting that even in the face of an explicit Board order directing an employer to violate contracts made with replacement workers, "the suit for damages for breach of contract could still be maintained without in any way prejudging the jurisdiction of the Board or the interest of the federal law in insuring the replacement of strikers." 463 U.S. at 512, 103 S.Ct.

7

at 3184.

The Supreme Court faced a similar issue in *J.I. Case v. NLRB,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). There the Court ordered an employer not to enforce individual employment contracts that forestalled collective bargaining or deterred self-organization. 321 U.S. at 341-42, 64 S.Ct. at 582. Nonetheless, the Court specifically preserved the right of the employees to seek damages for the breach of their individual agreements. *Id.*

GLI also makes much of *Bassette v. Stone,* 25 F.3d 757 (9th Cir.1994), cited by the district court for the proposition that Branson may have been able to bring his claim under section 8 of the NLRA. *Bassette* does hold that in addition to "limiting employers in which terms they may implement after impasse, section 8 requires that employers honor those terms once they are implemented ... the latter duty follow[ing] from the former." 25 F.3d at 761. In *Bassette,* however, the court confronted the claims of an employee represented under the expired collective bargaining agreement, who continued to work during negotiations over a new collective bargaining agreement and whose claim rested on a unilaterally implemented term validly implemented under section 8.

Whether or not we should accept *Bassette* generally is a question we leave for another day. At the very least, however, we decline to apply *Bassette* on the facts currently before us, where a replacement employee has challenged the breach of a promise arguably based on a unilaterally implemented term that the NLRB

8

already has determined violates section 8. Applying *Bassette* in this way would create an unacceptable incoherence in the duties required by section 8. It cannot both be an unfair labor practice to refuse to honor an implemented term and then also an unfair labor practice to continue to honor that same term.

In addition, simply labeling a term of employment "unilaterally implemented" cannot transform replacement workers into participants in the collective bargaining process. *See Service Elec. Co.,* 281 N.L.R.B. 633, 641 (1986) (holding that employer has no duty to negotiate with the union regarding the terms and conditions of the replacements' employment); *Leveld Wholesale, Inc.,* 218 N.L.R.B. 1344, 1350 (holding that union's duty of fair representation does not interfere with its ability to insist during negotiations that an employer terminate replacements to make room for returning strikers). These replacement workers come to work when no collective bargaining agreement is in effect, and they work under conditions that have not been collectively bargained for their benefit. *See Service Elec.,* 281 N.L.R.B. 633; *Leveld,* 218 N.L.R.B. at 1350 ("Strike replacements can reasonably foresee that, if the union is successful, the strikers will return to work and the strike replacements will be out of a job."); *cf. Belknap,* 463 U.S. at 513-514, 103 S.Ct. at 3184-3185 (Blackmun, J., concurring) ("During settlement negotiations, the union can be counted on to demand reinstatement for returning strikers as a condition for any settlement.").

To assert that such replacement workers must bring their

claims to the NLRB rather than to an appropriate court, seems to vest this federal administrative body with power over disputes purely private and independent of an unfair labor practice or collective bargaining agreement. *See* 29 U.S.C. § 160 ( giving Board jurisdiction only to prevent any person from engaging in any unfair labor practice); *see also National Licorice v. NLRB,* 309 U.S. 350, 366, 60 S.Ct. 569, 578, 84 L.Ed. 799 ("the National Labor Relations Act contemplates no more than the protection of the public rights which it creates and defines"). Federal labor law may create in represented employees a certain expectation and interest that an employer will abide by terms properly and unilaterally implemented during negotiations over a collective bargaining agreement. *See Bassette,* 25 F.3d at 760. Nevertheless, the expectations of replacement employees, who trust that an employer will keep its promises, stem from the different and more traditional source of state contract law. *See Belknap,* 463 U.S. at 507, 103 S.Ct. at 3181 (holding that even if replacement employees are "represented" by the Union in some technical sense, and thus governed by whatever settlement the Union negotiates to end the strike, this cannot change the Court's holding in *J.I. Case* that such currently "represented" employees may sue for damages on their non-collective contracts); *see also Caterpillar Inc. v. Williams,* 482 U.S. 386, 396, 107 S.Ct. 2425, 2431-32, 96 L.Ed.2d 318 (1987) (finding that a state-law plaintiff may be covered by a collective bargaining agreement, but still may have independent contract rights arising under state law).

10

The remainder of GLI's arguments for affirming the district court's finding of preemption relates to the possibility that a court might order GLI to behave in a manner contrary to the NLRB's decision.  As *Belknap* makes clear, however, "it will not be open to any tribunal to compel the employer to perform the acts, which, even though he has bound himself by contract to do them, would violate the Board's order or be inconsistent with any part of it." *Belknap,* 463 U.S. at 512 n. 13, 103 S.Ct. at 3184 n. 13 (quoting *National Licorice Co. v. NLRB,* 309 U.S. at 365, 60 S.Ct. at 577). GLI fails to recognize the flip side of this statement, that although no tribunal may order specific performance in the face of a contrary NLRB order, proper tribunals nonetheless may award damages for that very breach "without in any way prejudicing the jurisdiction of the Board or the interest of the federal law in insuring the replacement of strikers."  *Belknap,* 463 U.S. at 512, 103 S.Ct. at 3184.  *J.I. Case* makes a similar distinction, providing that its order for the employer to bargain collectively, despite the existence of non-expired individual contracts, is "without prejudice to the assertion of any legal rights the employee may have acquired under such contract or to any defenses there-to by the employer."  321 U.S. at 342, 64 S.Ct. at 582.

Because Branson's breach of contract claim is not based on activity arguably protected or prohibited under the NLRA, it is not preempted under *Garmon.*

### B

The district court also held that section 301 of the LMRA

11

preempted Branson's breach of contract claim because a resolution of the relevant allegations would depend on the analysis of one or more collective bargaining agreements. Because Branson bases his breach of contract claim on either the 1990 EBS program unilaterally implemented by GLI or a separate individual promise made to Branson, we disagree.[2]

The district court's ruling on preemption is a question of law which we review *de novo.* *Baker v. Farmers Elec. Coop., Inc.,* 34 F.3d 274, 278 (5th Cir.1994). Section 301 preempts state causes of action that allege the violation of a collective bargaining agreement affecting interstate commerce. *Allis-Chalmers Corp.,* 471 U.S. at 210, 105 S.Ct. at 1911; *Eitmann v. New Orleans Public Serv., Inc.,* 730 F.2d 359, 361-62 (5th Cir.1984). When the resolution of a state law claim substantially depends on the meaning of a collective bargaining agreement, courts must treat the claim as one made under section 301 or dismiss it as preempted by federal labor law. *Allis-Chalmers,* 471 U.S. at 220, 105 S.Ct. at 1916; *Thomas v. LTV Corp.,* 39 F.3d 611, 617 (5th Cir.1994). Nonetheless, section 301 does not necessarily preempt every state law claim between the parties to a collective bargaining agreement, nor does it preempt claims only tangentially related to such an

---

[2]In earlier proceedings, Branson made an alternative argument that "if for some reason the 1990 agreement should prove to be invalid, then Mr. Branson would nevertheless be entitled to his seniority under the plain and unmistakable language of the [1993] collective bargaining agreement itself." Because Branson does not reassert this argument in his briefs on appeal, it is waived. *See Zuccarello v. Exxon Corp.,* 756 F.2d 402, 407-08 (5th Cir.1985); FED. R. APP. P. 28.

agreement. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 409-11, 108 S.Ct. 1877, 1883-85, 100 L.Ed.2d 410 (1988); *Allis-Chalmers,* 471 U.S. at 211-12, 105 S.Ct. at 1911-1912; *Thomas,* 39 F.3d at 617.

In the instant case, GLI claims that resolution of Branson's breach of contract claim depends on the interpretation of the 1987 CBA. We disagree. Greyhound concedes that at the time Branson retired in 1987, he had accumulated 10.18 years of seniority under the 1987 CBA. Deciding whether or not GLI made a subsequent promise in 1990 to credit Branson with that amount of seniority, whether Branson relied on such a promise, and whether GLI breached such a promise will not require the interpretation of the 1987 CBA and thus cannot support a finding of preemption. *See Lingle,* 486 U.S. at 413, 108 S.Ct. at 1885 (holding that section 301 preempts "an application of state law ... only if such application requires the interpretation of a collective bargaining agreement").

GLI also claims that a court would have to consider the 1993 CBA's seniority provision "to consider the merits of the parties' dispute as to the nature of Branson's seniority." The seniority provision of the 1993 CBA, however, contains no precise definition of EBS, nor does it clarify whether EBS contemplated the extension of seniority credit only for non-Greyhound driving experience. Even if it did, what Greyhound and the Union say in 1993 (in the CBA) about what Greyhound and Branson agreed to in 1990 cannot alter the analysis of the 1990 agreement itself (unless one argues that the 1993 agreement supersedes the one made in 1990, an

13

argument addressed and rejected below).  Thus, if and when a court attempts to resolve the merits of this dispute over the nature of the seniority allegedly promised to Branson in 1990, interpreting the 1993 CBA will not prove necessary or useful.

GLI additionally claims that a court must consider the 1993 CBA's seniority provision "to consider GLI's defense that validity of its action is based on the NLRB's order."  We disagree.  While GLI indeed may attempt to use the NLRB order as a defense to the state contract claim, section 301 does not provide for the preemption of claims that might involve the interpretation of an NLRB order.  *See Belknap,* 463 U.S. at 512, 103 S.Ct. at 3184.  Simply pointing out that the 1993 CBA anticipates the issuing of such an order cannot transform GLI's defense into one based on the 1993 CBA.[3] To the extent that such a defense would implicate the 1993 CBA at all, it would do so only tangentially, and thus would not preempt the underlying state claim.[4] *See Allis-Chalmers,* 471

---

[3]The 1993 CBA anticipates an NLRB order because Greyhound and the Union explicitly agreed to leave the resolution of EBS to the NLRB and to abide by whatever decision the NLRB made.

[4]The Supreme Court faced, but refused to decide, a similar issue in *Caterpillar Inc. v. Williams,* where former employees brought a breach of contract suit in state court against their former employer based on alleged individual employment contracts. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).  The employer sought to remove the case to federal court, arguing that its intent to raise a collective bargaining agreement as a defense mandated preemption under section 301.  *Id.* at 390, 107 S.Ct. at 2428.  Because of the procedural posture of the case—whether or not removal of the state claims to federal court was appropriate—the Supreme Court expressly declined to rule on the merits of the preemption issue.  482 U.S. at 398 n. 13, 107 S.Ct. at 2433 n. 13. Nonetheless, the Court expressly held that section 301 does not so "completely preempt" a state law claim for breach of contract that simply raising a collective bargaining

U.S. at 211, 105 S.Ct. at 1911 ("not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301").

GLI also argues that section 301 preempts Branson's breach of contract claim because the alleged individual seniority agreement seeks to limit or condition the 1993 CBA. Yet each of the cases that Greyhound cites for this proposition concern individual agreements made in the context of currently binding collective bargaining agreements. *See Thomas,* 39 F.3d at 617-18; *Eitmann,* 730 F.2d at 363. In *Thomas,* we held that an individual attendance probation agreement negotiated by the employee, his union, and the employer that set forth minimum attendance requirements for the year and modified the discharge procedures of the existing CBA, would be treated as a CBA for section 301 preemption purposes. *Thomas,* 39 F.3d at 614-17. In *Eitmann,* we found that where an employer's pre-employment promises conflicted with the collective bargaining agreement in effect at the date of hire, section 301 would preempt a state law claim based on that pre-employment promise. 730 F.2d at 360-63.

Here, in contrast to the cases cited by Greyhound, at the time

---

agreement as a defense would merit removal. *Id.; see also Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 24, 103 S.Ct. 2841, 2854, 77 L.Ed.2d 420 (1983)("[I]f a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily "arises under' federal law."). The Court noted that even when an employer-defendant alleges that a subsequent collective bargaining agreement supersedes the individual agreement at issue, section 301 does not necessarily mandate preemption. 482 U.S. at 394-97, 107 S.Ct. at 2430-32.

Branson allegedly struck his individual deal with Greyhound, the 1987 CBA had expired and the bargaining parties had yet to agree on the 1993 CBA. In fact, Branson was a replacement employee and had no interest in the CBAs. *See Service Elec.,* 281 N.L.R.B. at 641 (employers have no duty to bargain with a striking union about terms for replacement employees). Thus, because no collective bargaining agreement governed at the time Branson and Greyhound allegedly made their individual contract, we cannot find that Branson's individual claim seeks to limit or condition a collective bargaining agreement.

Whether or not the 1993 CBA supersedes the alleged individual agreement, even though made outside the context of a binding collective bargaining agreement, presents a different issue. GLI relies on *J.I. Case* for the proposition that collective bargaining agreements must supersede and thus preempt individual employment contracts. Yet while *J.I. Case* did state broadly that the "very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees," *see* 321 U.S. at 338, 64 S.Ct. at 580, the Court also explicitly sought to preserve the rights of employees to seek damages based on these superseded individual contracts. *See* 321 U.S. at 342, 64 S.Ct. at 582.

The Supreme Court has attempted to correct this type of erroneous interpretation before. In *Caterpillar,* the employer "argue[d] that when respondents returned to the collective-bargaining unit, their individual employment agreements

16

were subsumed into, or eliminated by, the collective bargaining agreement." 482 U.S. at 395-96, 107 S.Ct. at 2431. With unmistakable clarity, the Court responded:

> Caterpillar is mistaken ... *J.I. Case* does not stand for the proposition that all individual employment contracts are subsumed into, or eliminated by, the collective-bargaining agreement.... Thus, individual employment contracts are not inevitably superseded by any subsequent collective agreement covering an individual employee, and claims based upon them may arise under state law.

482 U.S. at 396, 107 S.Ct. at 2431 (citations omitted). "Caterpillar's basic error," continued the Court, "is its failure to recognize that a plaintiff covered by a collective bargaining agreement is permitted to assert legal rights independent of that agreement, including state law contract rights, so long as the contract relied upon is not a collective bargaining agreement." *Id.* Whether Branson's claim for breach of contract arises out of a purely individual agreement, as he alleges, or out of Greyhound's unilateral implementation of EBS, as GLI alleges, no one posits that his claim arises out of a contract that is itself a collective bargaining agreement.[5] GLI's arguments of supersession thus cannot withstand appropriate scrutiny.

In its final plea for a finding of section 301 preemption, GLI

---

[5]GLI does half-heartedly assert that the EBS provisions are the "functional equivalent" of a collective bargaining agreement for preemption purposes. We disagree. The 1990 contract terms were not a collectively bargained instrument, and were functionally distinct in many ways. *See Thomas,* 39 F.3d at 618 (defining collective bargaining as "bargaining by an organization or group of workmen on behalf of its members with the employer"). The terms were implemented unilaterally by GLI and were implemented three days after being presented to the union. Lastly, section 301 preempts claims that depend on a CBA, not its functional equivalent. *Allis-Chalmers,* 471 U.S. at 220, 105 S.Ct. at 1916.

17

notes that should Branson prevail on his breach of contract claim, a court could not determine Branson's damages without looking to the rates of pay included in the 1993 CBA, or the parameters of any proper injunction without looking to the seniority provisions of the 1995 modification. Assuming *arguendo* that this proposition is true, it hardly establishes that Branson's underlying claim "is substantially dependent upon" an analysis of the terms of a collective bargaining agreement. *Allis-Chalmers,* 471 U.S. at 211, 105 S.Ct. at 1916. Indeed, the Supreme Court rejected this very argument in *Lingle,* 486 U.S. at 413 n. 12, 108 S.Ct. at 1885 n. 12, holding that while collective bargaining agreements may contain information such as rates of pay, possibly helpful in determining the damages due to a worker prevailing in a state-law suit, and while "federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand."

GLI has presented no persuasive authority for the proposition that section 301 preempts Branson's breach of contract claim.

## III

Branson appeals the district court's decision in favor of the Plan on two grounds: first, Branson argues that the district court erred in using the abuse of discretion standard to review the Trustees' interpretation; and second, he argues that the Trustees' interpretation was nonetheless an abuse of discretion. We disagree on both counts.

The district court applied an abuse of discretion standard

18

because it found that the Plan conferred discretionary authority on the Trustees. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989); *Chevron Chem. Co. v. Oil, Chem. and Atomic Workers Local Union 4-447,* 47 F.3d 139, 142 (5th Cir.1995). Whether the district court employed the correct standard of review for analyzing the Trustees' interpretation of the Plan is a question of law which we review *de novo. Chevron Chem.,* 47 F.3d at 142.

The district court must apply an abuse of discretion standard only when the Plan itself confers discretionary authority on the Trustees to interpret the Plan. *See Firestone Tire,* 489 U.S. at 115, 109 S.Ct. at 956-57 ( holding that "a denial of benefits ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"); *Chevron Chem.,* 47 F.3d at 142. In *Chevron Chem.,* we held that the district court correctly used the abuse of discretion standard where the pension plan conferred discretionary authority in the following manner: "[T]he administrator is empowered to "make such rules, regulations, [and] *interpretations* ... and [to] take such other action ... as [he] may deem appropriate.' " 47 F.3d at 143 (emphasis and alterations in original) (quoting pension plan).

In the case at hand, the Plan uses similar language to confer discretionary authority upon the Trustees. Section 6.2 of the Plan states that the Trustees have the power "[t]o decide any question

19

arising in the administration, interpretation, and application of this Plan." Consequently, the district court correctly used the abuse of discretion standard to review the decision of the Trustees.

Branson argues, however, that the Trustees here are subject to a "suspicion of partiality"[6] and that the district court should have used a sliding scale—something less than the abuse of discretion standard—to review the Trustees' decision. *See Lowry v. Bankers Life and Casualty Retirement Plan,* 871 F.2d 522, 525 & n. 6 (5th Cir.1989) (suggesting the possibility of using a sliding scale to review trustees' decision). We disagree.

The district court found, as a matter of fact, that no animosity toward replacement workers influenced either Greyhound or the Union. We review the district court's factual findings for clear error. *See Bellaire Gen. Hosp. v. Blue Cross Blue Shield,* 97 F.3d 822, 829 (5th Cir.1996). Branson does not dispute that in 1990 the Union helped him correct Greyhound records to reflect his actual starting date and that later, the Union pursued Branson's grievance regarding a company decision to place him on sick leave for an extended period of time. Under these circumstances, we cannot say that the district court committed clear error in finding no suspicion of partiality. Thus, the district court was correct in refusing to use a suspicion of partiality as a factor in

---

[6]Branson claims that the Plan operates under a conflict of interest because the Plan is managed by a six-member Board of Trustees, half chosen by the Union and half by Greyhound, none of whom have an interest in helping former strike-breakers.

20

determining whether the Trustees abused their discretion.

Branson additionally claims that the district court erred in finding no abuse of discretion because: (1) the Trustees looked to the 1987 CBA instead of the 1993 CBA to determine whether Branson lost his seniority;[7] and (2) even the 1987 CBA did not explicitly state that Branson would lose his seniority when he quit. We review *de novo* the district court's ultimate legal conclusion that there was no abuse of discretion by the Trustees. *See Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 601 (5th Cir.1994).

A two-step inquiry governs whether the Trustees abused their discretion in refusing to give Branson the additional seniority he claimed. *Pickrom v. Belger Cartage Serv., Inc.,* 57 F.3d 468, 471 (5th Cir.1995). First, we determine whether the Trustees gave the Plan a "legally correct" interpretation. *Id.* Second, if we find that the Trustees' interpretation is not legally correct, we must determine whether the Trustees' decision constituted an abuse of discretion. *Id.* In deciding the first step—whether the Plan's interpretation was legally correct—we consider three factors: (1) whether the Trustees have given the pension plan a uniform construction; (2) whether the Trustees' interpretation is consistent with a fair reading of the Plan; and (3) whether different interpretations of the Plan will result in unanticipated

---

[7]Branson also appears to argue that the Trustees should have looked to the 1990 Agreement implemented unilaterally by Greyhound to determine whether he lost his seniority. This argument ignores the fact that under section 11.1 of the Plan, any action taken by Greyhound without the concurrence of the Union can have no effect on the Plan.

21

costs. *Id.; Chevron Chem.,* 47 F.3d at 145.

In the instant case, the first factor proves insignificant because the Trustees have not previously interpreted the relevant provisions. Although not determinative, the third factor of unanticipated costs supports the Trustees. Indeed, the Trustees' interpretation seems designed to thwart the very unanticipated costs that Branson's interpretation inevitably would produce. Particularly with employees like Branson, who have accumulated long terms of seniority and then left the company, attempting to arrange actuarially for the possibility that these employees might reenter the Plan at any moment, demanding immediate recognition of substantial terms of seniority, certainly results in unanticipated costs.

The second factor, relating to whether or not the Trustees' engaged in a "fair reading of the Plan," forms the basis of Branson's argument that the Trustees' abused their discretion in interpreting the Plan to deny him additional seniority credit. We find, however, that the Trustees' interpretation is a fair reading of the Plan.

Section 2.1 of the Plan provides:

Notwithstanding anything to the contrary in this Section 2.1(1), however, an Active Participant who subsequently terminates employment with an Employer and thereupon loses his seniority under the Collective Bargaining Agreement ... shall thereafter cease to be an Active Participant regardless of whether such Participant is subsequently re-employed by an Employer or a Related Employer.

The Plan provides in 2.3(2) that only Active Participants may accrue pension credit or benefits under the Plan. In 1987, Branson

22

was an "Active Participant who subsequently terminate[d] employment with an Employer." Thus, the question for the Trustees became whether Branson "thereupon los[t] his seniority under the Collective Bargaining Agreement." The Trustees found that Branson *did* lose his seniority under the 1987 CBA and thus "cease[d] to be an Active Participant" in the Plan, meaning that he could no longer accrue additional pension credit, regardless of his later re-employment.

Branson argues that using the 1987 CBA does not comport with a fair reading of the Plan because the definition of "Collective Bargaining Agreement" includes not only "[t]he current collective bargaining agreement between the Company and the Union," but also any "extensions thereof, or any successor agreements between the parties." This definition, however, cannot alter the import of the phrase "*thereupon* loses his seniority" in section 2.1 (emphasis added). Black's Law Dictionary defines "thereupon" as: "without delay or lapse of time." BLACK'S LAW DICTIONARY 1478 (6th ed.1990). Webster's New Collegiate Dictionary similarly defines "thereupon" as "immediately after that." WEBSTER'S NEW COLLEGIATE DICTIONARY 1201 (1979). Thus, the Trustees did engage in a fair reading of the Plan by looking to the collective bargaining agreement in effect "immediately after" Branson terminated his employment in 1987.

Branson also argues that the Trustees failed to make a fair reading of the Plan by interpreting the 1987 CBA to impliedly revoke seniority for employees who voluntarily quit. We disagree. Branson correctly notes that the 1987 CBA neither explicitly

23

protects nor explicitly revokes the seniority of employees who voluntarily quit. The 1987 CBA does, however, explicitly retain seniority for several categories of employees, including: employees entering the armed forces, employees receiving leaves of absence for less than 30 days, employees furloughed as part of a reduction in force (so long as they return to work when it becomes available), employees in the service of the union, and employees accepting supervisory positions (so long as they resume a position within the bargaining unit within 24 months). The Latin maxim *expressio unius est exclusio alterius* proves instructive. The Trustees found that the inclusion of specific circumstances in which an employee retained seniority meant that an employee did not retain seniority in other circumstances. Consequently, those employees who voluntarily quit "lost" their seniority, and the Plan could not allow any later accumulation of additional seniority. Branson has failed to show that this is not a fair reading of the Plan.

Having found that the Trustees' interpretation of the Plan was legally correct, we need not proceed to the second step of our analysis. *Pickrom v. Belger Cartage Serv., Inc.,* 57 F.3d 468, 472–73 (5th Cir.1995). The Trustees did not abuse their discretion in interpreting the Plan.

IV

In summary, we hold that Branson's breach of contract claim

24

against Greyhound is not preempted by the NLRA or the LMRA.[8] We reverse and remand to the dis-

trict court for proceedings consistent with this opinion.[9]  We affirm the district court's judgment in favor of the Plan.

---

[8]We affirm the district court's denial of Branson's motion for summary judgment on his breach of contract claim against Greyhound. The record discloses several genuine issues of material fact, including the type, if any, of seniority credit Greyhound offered Branson, what that seniority credit would have done for Branson, whether or not Greyhound's subsequent behavior contradicted any accepted offer and whether Greyhound has any viable defenses.

[9]Branson's only remaining claim is a breach of contract based on state law.  In light of this opinion, the district court may revisit its decision to exercise supplemental jurisdiction over Branson's state law claim. *See Parker & Parsley Petroleum Co. v. Dresser Indus.,* 972 F.2d 580, 585 (5th Cir.1992) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed.").