# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 9, 2009

Charles R. Fulbruge III
Clerk

No. 08-60347

COASTAL INTERNATIONAL SECURITY INC

Petitioner - Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD

Respondent - Cross-Petitioner

Petition for Review and Cross-Petition for Enforcement of an Order of
the National Labor Relations Board
Case No. 16-CA-23864

Before KING, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Coastal International Security, Inc. petitions for review of the National Labor Relations Board's decision and order finding that it violated Sections 8 (a)(1) and (5) of the National Labor Relations Act by unilaterally changing the training-period wage of newly hired employees under the predecessor-employer's collective bargaining agreement and by not providing the employees' union the opportunity to bargain. Coastal International Security, Inc. claims that these trainees were never part of the bargaining unit or, if they were, that it exercised

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

its right to set the initial terms of employment by immediately paying the new trainees a lower wage than had the predecessor employer. For the reasons stated below, we deny the petition for review and grant enforcement of the order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to a 2003 government contract, Coastal International Security, Inc. ("CIS") provided security services to several federal buildings in northern Texas. Prior to CIS, the contract for these securities services was held by Security Consultants Group, Inc. ("SCG"), and prior to that by Sooner Process and Investigation ("Sooner"). Both Sooner and SCG paid their trainees the same wage during their training period as fully credentialed security guards were paid.

In September 2001, SCG and the International Union of United Government Security Officers of America and its Local 203 (the "Union") entered into a new collective bargaining agreement (the "CBA"). Article III, Section 1 of the CBA (the "recognition clause") defined the bargaining unit as:

> [A]ll security officers as defined in Section 9(b)(3) of the National Labor Relations Act, as amended, employed by the Company under the GSA security services contract #GS-07P-00-HHD-0035, or any successor contracts, in Ft. Worth, TX and surrounding areas.

That same provision expressly excluded the following employees from the bargaining unit: "all office clerical employees, professional employees, and supervisors as defined in the Act."

After successfully bidding on the contract, CIS hired a majority of the former SCG security guards. It admits that it was a successor employer for purposes of *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972). CIS expressly adopted the CBA between SCG and the Union in two separate letters of understanding without any changes to the employment terms of guards.

2

Starting with the first class of trainees hired prior to beginning work on the contract, CIS paid trainees minimum wage rather than the rate provided for guards in the CBA. This practice directly contradicted the predecessor employers' practice. CIS gave the Union no notice of this change.

On September 9, 2004, the Union filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"). This charge was deferred to the CBA's grievance and arbitration procedures pursuant to the NLRB's long-standing policy of deferring unfair labor practice claims until the end of the grievance process. CIS took the position that it would not process this claim as a grievance because the trainees were not part of the bargaining unit represented by the Union.

On May 29, 2007, the Regional Director of the NLRB revoked the deferral and issued a complaint against CIS for unilaterally changing the wage rate of the trainees in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA").[1] The case was referred to an administrative law judge ("ALJ") who found that the trainees were part of the bargaining unit under the language of the recognition clause and also based on their "historical inclusion in the unit" by Sooner and SCG. The ALJ concluded that CIS had violated Sections 8(a)(1) and (5) "[b]y unilaterally, without notice to or bargaining with [the Union], paying newly hired employees $5.15 per hour rather than the contractual wage rate." CIS appealed this decision to the NLRB. On March 28, 2008, the NLRB issued its Decision and Order (the "Order") affirming the ALJ's

---

[1] Section 8(a)(5) states that it is an unfair labor practice "to refuse to bargain collectively with the representatives of [the employer's] employees." 29 U.S.C. § 158(a)(5). Section 8(a)(1) reinforces this obligation by making it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." *Id.* § 158(a)(1). Collectively, "Sections 8(a)(5) and (1) of the Act oblige an employer to notify and consult with the Union concerning changes in wages, hours and conditions of employment." *NLRB v. Pinkston-Hollar Constr. Servs., Inc.*, 954 F.2d 306, 310 (5th Cir. 1992).

findings. On April 21, 2008, CIS filed a timely petition for review of the Order with this court.

## II. STANDARD OF REVIEW

"This court's review of [an] NLRB[] decision is more than a mere rubber stamp of the decision; however, a certain degree of deference is accorded." *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996). We uphold an NLRB decision "if it is reasonable and supported by substantial evidence on the record considered as a whole." *Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518 (5th Cir. 2007) (quotation marks omitted); *see also Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003) ("Because the Court is not left merely to accept the Board's conclusions, the Court must be able to conscientiously conclude that the evidence supporting the Board's determination is substantial." (quotation marks omitted)). "Substantial evidence is such relevant evidence as a reasonable mind would accept to support a conclusion." *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003) (quotation marks omitted).

With respect for the NLRB's expertise in labor law, we "will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case *de novo*." *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) (quotation marks omitted). This deference applies to both the NLRB's findings of fact and application of the law. *Strand*, 493 F.3d at 518; *see also* 29 U.S.C. § 160(e) and (f). However, this court conducts a de novo review of the NLRB's legal conclusions, "including its interpretation of a collective-bargaining agreement." *Strand,* 493 F.3d at 518. Although we remain "mindful of the [NLRB's] considerable expertise in interpreting collective bargaining agreements," *J. Vallery*, 337 F.3d at 450 (quotation marks omitted), "we need accord no deference to the Board's" construction of a labor contract. *Miss. Power Co. v. NLRB*, 284 F.3d 605, 619

(5th Cir. 2002); *see also BP Amoco Corp. v. NLRB*, 217 F.3d 869, 873 (D.C. Cir. 2000).

## III. DISCUSSION

CIS advances three arguments: (1) the plain language of the CBA excluded the trainees from the bargaining unit; (2) the predecessor employers did not have a past practice of including the trainees as members of the bargaining unit; and (3) assuming the trainees were part of the bargaining unit, CIS exercised its right to unilaterally set the initial terms of employment after taking over from the predecessor employer.[2] Although we conclude that, if we look only to the plain language of the CBA, the trainees are not included in the bargaining unit, we also conclude that substantial evidence supports the NLRB's determination that the predecessor employers' past practices establish a course of dealing that included the trainees in the bargaining unit. Additionally, the

---

[2] CIS also argued that the NLRB was not an appropriate forum to adjudicate this dispute because it was solely a contract interpretation issue that should have been filed in federal court under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, rather than as an unfair labor practice claim. This argument is undermined by CIS's acknowledgment that there could be no determination of whether there was a Section 8(a)(1) and (5) violation for failure to bargain without a foundational finding that the trainees were part of the bargaining unit under the CBA. Thus, CIS admits that this is a mixed case that requires a contract interpretation in order to determine whether a successor employer's failure to bargain violated the NLRA. In such cases, the NLRB remains an appropriate forum to adjudicate both questions—the interpretation of the CBA and whether there was a violation of the NLRA. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202 (1991) (noting that the NLRB "has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication"); *see also NLRB v. C&C Plywood Corp.*, 385 U.S. 421, 428 (1967) (holding that the NLRB "in necessarily construing a labor agreement to decide this unfair labor practice case, has not exceeded the jurisdiction laid out for it by Congress"); *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 202 (5th Cir. 1992) (stating that "'the authority of the [National Labor Relations] Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301'" (quoting *Smith v. Evening News Ass'n*, 371 U.S. 195, 197 (1962))); *NLRB v. BASF Wyandotte Corp.*, 798 F.2d 849, 857 (5th Cir. 1986) ("Where the contract violation is also a unilateral change by the employer in working conditions subject to mandatory bargaining . . . there can be both a contract violation and a § 8(a)(5) violation.").

NLRB correctly held that CIS lost its right to set the initial terms of employment by agreeing to be bound by the terms of the predecessor employer's CBA.

First, CIS argues that the trainees are not part of the bargaining unit under the plain language of the CBA's recognition clause. The recognition clause contains two requirements for membership in the bargaining unit: the employee must (1) meet the statutory definition of a security officer under Section 9(b)(3) of the NLRA and (2) be employed under the specified government contract. The trainees in this case do not satisfy either requirement.

Regarding the first requirement, Section 9(b)(3) of the NLRA states that a security guard is "any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises." It further states that no unit shall consist of both guards and non-guards.[3] In determining whether an employee qualifies as a guard, the NLRB looks to "the nature of the duties of guards and not the percentage of time which they spend in such duties." *Rhode Island Hosp.*, 313 NLRB 343, 346 (1993). However, in order to be a guard under Section 9(b)(3), the employee's guard responsibilities must be "not a minor or incidental part of their overall responsibilities." *Id.* at 347; *see also Boeing,* 328 NLRB at 130; *J.C. Penney Co., Inc.*, 312 NLRB 32, 33 (1993). More than "minor or incidental" means that guards cannot be employees "who carry out no security functions at all." *Burns Sec. Servs.*, 300 NLRB 298, 301 (1990).

---

[3] The policy behind Section 9(b)(3) is to avoid any potential conflicts from having guards enforcing rules against non-guards within the same bargaining unit. *See Boeing Co.*, 328 NLRB 128, 130 (1999); *see also Wackenhunt Corp. v. NLRB*, 178 F.3d 543, 546 (D.C. Cir. 1999). Under the particular circumstances of this case, where the employer effectively recognized a mixed guard and non-guard (i.e., trainees) unit, that policy would not be threatened.

The trainees in this case do not satisfy Section 9(b)(3)'s definition of a security guard.[4] Until they completed the training and received their GSA certification, the trainees were not permitted to perform *any* guard or security duties. The trainees received classroom instruction at an off-site location and did not work side-by-side with guards conducting security functions. Their only duty was to attend class and receive instruction.

The NLRB suggests that guard responsibilities include "training in security procedures [and] weapons training and possession." *Boeing*, 328 NLRB at 130. Thus, rather than having no security function at all, the NLRB argues that 100% of the training time qualifies as a security function. While the NLRB's quotation from *Boeing* standing alone may appear to have this broad meaning, the cases cited in support of the quotation reveal that the NLRB has misinterpreted its context. In the cases cited in *Boeing*, a lack of security training was used to show that a certain type of employee could not qualify as a guard. *Wolverine Dispatch, Inc.*, 321 NLRB 796, 798 (1996) (receptionists); *55 Liberty Owners Corp.*, 318 NLRB 308, 308–09 (1995) (doorpersons and elevator operators); *Burns*, 300 NLRB at 300–01 (firefighters were not security guards despite receiving security training). *Boeing* never implies that the act of receiving training is itself a security guard responsibility.

The trainees in this case also fail to meet the second requirement of the recognition clause because they were not employed under the specified government contract. The contract required employees to complete their

___

[4] The Order cites *Old Dominion Security*, 289 NLRB 81 (1988), for the proposition that the Board considers guards-in-training to be guards for purpose of Section 9(b)(3). The employer in that case created two classes of guards. Class I guards were guards-in-training and received $3.85 an hour; Class II guards had completed training and received $5.49 an hour. Unlike *Old Dominion*, there is only one class of guards in the CBA in this case. Although *Old Dominion* may show that there is not necessarily a Section 9(b)(3) conflict between having guards and guards-in-training in the same bargaining unit, it does not go so far as to hold that guards-in-training are no different than regular guards.

training and receive GSA certification prior to performing any services on the contract. Thus, it is undisputed that the trainees were not performing actual security services under the contract. However, the Order concluded that this requirement was satisfied because the trainees were hired in contemplation of staffing this specific contract. Being hired "in contemplation" of a contract is not the equivalent of being employed "under" the contract, particularly in light of the fact that many of the trainees would never complete the training or would be posted at other locations under different contracts. Furthermore, the Vice-President of Human Resources for CIS's parent company testified that the training hours are not billed directly to the government in connection with this contract because the trainees are not performing any contracted-for services while being trained. Since the trainees were not performing any services required by the contract and lacked the certification to perform those services, the trainees could not be employed "under" the contract as required by the recognition clause.[5]

The NLRB claims that several terms other than the recognition clause support its interpretation of the CBA that the trainees were members of the bargaining unit. First, it notes that the trainees do not appear on the list of categories of employees who are excluded from the bargaining unit. This argument is unpersuasive because not being included on such a list cannot default to guard status when the plain language of the recognition clause would not include the trainees in the unit. The single case cited in support of this argument is distinguishable. In *Branson v. Greyhound Lines, Inc.*, 126 F.3d 747, 758 (5th Cir. 1997), there was only a single list of circumstances, rather than one

---

[5] Although we recognize that the Department of Labor may have made a preliminary finding in 2005 that 14 pre-contract trainees were entitled to payment under the CBA, that finding was made pursuant to the rules for the awarding of contracts under the Service Contract Act, 41 U.S.C. § 351, and is not binding here.

clause providing a definition and one clause creating exclusions to that defined group. The court concluded that by not appearing on that single list, the subject circumstance was intended to be excluded. Here, the trainees were omitted from both the inclusive and the exclusive list. The NLRB's argument fails because, ultimately, the trainees can never meet the two explicit requirements to be members of the bargaining unit.

Next, the NLRB argues that the seniority provisions of the CBA require the trainees to be included in the bargaining unit. The CBA creates two classes of seniority, government seniority and bargaining unit seniority. Government seniority is "[t]he total length of time spent by an employee in any capacity in the continuous service of the present (successor) contractor, including both the time spent in performing on regular commercial work and the time spent in performing on the Government contract itself." Bargaining unit seniority is "[a]n employee's date of hire into the bargaining unit." The CBA also states that "the Bargaining Unit Seniority and Government Seniority of employees will usually be the same date in most circumstances." Based on these definitions, the NLRB asserts that in order for these two dates to be the same in most circumstances, they must start running at the first date of hire and not at the completion of training. Indeed, there was testimony that this was the practice of the predecessor employers. While this argument may favor the NLRB's interpretation, it is still outweighed by the plain language of the more specific recognition clause. Instead, this argument is more strongly supportive of the NLRB as course of dealing evidence as discussed below.

In sum, based upon a de novo review of the NLRB's interpretation of the CBA, the trainees were not members of the bargaining unit under the plain language of the CBA.

Next, we consider whether there is substantial evidence to support the NLRB's finding that the predecessor employers had a past practice of including

9

trainees in the bargaining unit. CIS admits that it was a successor employer under *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972). "A successor employer is required to recognize and negotiate with the bargaining agent of the predecessor's employees if the bargaining unit remains appropriate and the successor does not have a good faith doubt of the union's continuing majority support." *Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 114 (D.C. Cir. 1996). "Where a collective bargaining agreement embodies a particular working condition and past practice demonstrates that an employer had administered that working condition in a particular manner, the employer is forbidden from changing that condition unilaterally." *BASF Wyandotte*, 798 F.2d at 853; *see also Blitz Maint.*, 297 NLRB 1005, 1008–09 (1990) (noting that the predecessor's past practices "are kept in place by virtue of Section 8(a)(5) of the Act rather than by force of contract"). Additionally, "there is a strong presumption favoring the maintenance of historically recognized bargaining units. The Board is reluctant to disturb units established by collective bargaining so long as those units are not repugnant to Board policy or so constituted as to hamper employees in fully exercising rights guaranteed by the Act." *Trident Seafoods,* 101 F.3d at 114 (quotation marks omitted). Thus, if Sooner and SCG established a practice of including trainees in the bargaining unit, the trainees were still members of the unit after CIS became the successor employer and CIS would have had a duty to bargain with the Union over changing their wage.

The Order states that "[t]he payment of the contractual rate to newly hired guard employees in training by the predecessors established a past practice." It cites no other evidence in support of this finding. CIS argues that this single fact only establishes a practice of paying a specific salary, not a practice of including the trainees as members of the bargaining unit. While equal pay is strong evidence supporting an inference that the predecessor employers included trainees in the bargaining unit, we need not decide whether that fact alone

10

constitutes substantial evidence because the record contains other examples—not mentioned in the Order—of the predecessor employers treating the trainees as members of the bargaining unit.

Aside from equal pay, the NLRB points to other course of dealing evidence indicating that the trainees were treated as members of the bargaining unit by Sooner and SCG. There was testimony that the predecessor employers paid trainees a wage supplement for health and welfare benefits during their training period and they began calculating the trainees' seniority date from the date they started training, not the date they completed training. Both of these practices are consistent with including the trainees as members of the bargaining unit under the terms of the CBA.

Unable to dispute these facts, CIS is forced to rely on the absence of what might be more compelling evidence of including the trainees in the bargaining unit, such as rosters identifying trainees as members of the unit, authorization cards signed by trainees, or dues payments by trainees. The absence of these more conclusive forms of evidence does not detract from the evidence presented. Based on the fact that the predecessor employers paid the trainees the same wage as guards, paid them the health and welfare benefit supplement, and calculated their seniority date based on their hiring date rather than the date of the completion of their training, we determine that the NLRB's conclusion that the predecessor employers had a practice of including the trainees in the bargaining unit was supported by substantial evidence.

Finally, as we have now concluded that the trainees were members of the bargaining unit, CIS argues that it exercised its right under *Burns* to unilaterally set the initial terms of employment after taking over from a predecessor employer when it started paying the trainees at a lower wage. The NLRB argues that CIS lost the right to change the initial terms of employment after it adopted the CBA.

11

In *Burns*, the successor employer retained a majority of the predecessor employer's employees, giving rise to a duty to bargain with the employees' union. 406 U.S. at 275, 278, 281. But merely having a duty to bargain does not mean that the successor employer is "bound to observe the substantive terms of the collective-bargaining contract the union had negotiated with" the predecessor employer. *Id*. at 281–82, 284. The Supreme Court recognized that, under certain circumstances, it would be beneficial for the employer to voluntarily adopt the predecessor's CBA: "In many cases, of course, successor employers will find it advantageous not only to recognize and bargain with the union but also to observe the pre-existing contract rather than to face uncertainty and turmoil." *Id*. at 291.

The successor employer in *Burns* made it "perfectly clear" that it did *not* intend to assume the terms of the predecessor's CBA. *Id*. at 285. The NLRB argues that CIS was not free to unilaterally change a term in the CBA because it was "perfectly clear" that it *would* assume the terms of the predecessor's CBA. *Id*. at 294–95 ("Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.").

Shortly after *Burns*, the NLRB interpreted this exception:

We believe the caveat in *Burns*, therefore, should be restricted to circumstances in which the new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or conditions of employment, or at least to circumstances where the new employer . . . has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.

*Spruce Up Corp*., 209 NLRB 194, 195 (1974) (footnote omitted).

This Court previously summarized the holdings in *Burns* and *Spruce Up* as follows:

> Generally, a successor employer is not bound by its predecessor's CBA. However, certain rules govern an employer's successorship. When a successor employer takes over for its predecessor it has certain recognized rights and duties. The employer can institute its own initial terms and conditions of employment by giving the employees prior notice of its intention. *NLRB v. Burns Int'l Security Serv.*, 406 U.S. 272, 294 (1972). If not, and the employer holds itself as if it will adhere to the terms of the previous CBA, then in order for the employer to change terms of that agreement, it must bargain for those changes. *Spruce-Up Corp.*, 209 NLRB 194, 195 (1974), enforced without op., 529 F.2d 516 (4th Cir. 1975). Moreover, any unilateral changes to the predecessor's CBA may take place only after bargaining to an impasse. *NLRB v. Edjo, Inc.*, 631 F.2d 604, 606–08 (9th Cir. 1980). Failure to negotiate or negotiate to an impasse will result in a violation of § 8(a)(5) of the Act.

*NLRB v. Houston Bldg. Servs., Inc.*, 128 F.3d 860, 864 n.6 (5th Cir. 1997).

In this case, CIS made it perfectly clear that it wanted to adopt the terms of the CBA without change when it executed the Letter of Understanding stating that "All other provisions, terms, and conditions of the [CBA], except as provided herein, shall continue in full force and effect." CIS agreed to be bound by the terms of the CBA in the letters of understanding and it informed the former SCG employees that the terms and conditions of their employment would not be changed. Thus, it is precisely the type of successor employer described in *Spruce Up* as fitting within the *Burns* exception requiring initial terms to be bargained for with the Union. After agreeing to hire a majority of the predecessor's employees and to be bound by the terms of the CBA, CIS lost its right to unilaterally set the initial terms of employment pursuant to *Burns* and *Spruce Up*. Instead, it was obligated to bargain with the Union about its proposed changes. *Cf. SFX Target Ctr. Arena Mgmt.*, 342 NLRB 725, 725 n.3 (2004) (noting that the scope of the bargaining unit is not something that can be

unilaterally set as an initial term or condition of employment). The fact that individual trainees were new hires and their identities were likely unknown to the Union at their start is of no moment. The duty is to bargain with the representative of a unit that has been determined by job category or categories rather than by the individuals that happen to hold the job or jobs at issue. *See NLRB v. Saint Francis Coll.*, 562 F.2d 246, 248 (3d Cir. 1977).

In sum, the plain language of the CBA did not include the trainees as members of the bargaining unit, but, as the NLRB correctly held, the past practice of the predecessor employers was to include them in the bargaining unit. CIS lost its right to set the initial terms of employment as a successor employer under *Burns* when it agreed to be bound by the terms of the CBA. Accordingly, as the NLRB held, CIS had an obligation to bargain with the Union before it changed the pay of the trainees.

## IV. CONCLUSION

For the reasons stated above, we DENY CIS's petition for review and GRANT enforcement of the NLRB's Order.

Petition for review DENIED. Order ENFORCED.