United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 5, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 03-60374 & No. 04-60054

MONICA BAUER HESLING,
Guardian and Next Friend of minors,
HANNAH BUCK and CHELSEY BUCK,

Plaintiff-Appellant,

versus

CSX TRANSPORTATION, INC., and
NATIONAL RAILROAD PASSENGER
CORPORATION d/b/a AMTRAK,

Defendant-Appellees.

Appeals from the United States District Court
for the Southern District of Mississippi

Before BENAVIDES, STEWART, and CLEMENT, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This appeal arises out of an automobile-train collision in Long Beach, Mississippi, involving

the decedent, Erica Bauer Valentine ("Valentine"), and a train owned by National Railroad Passenger

Corporation ("Amtrak"), which was operating on single-rail tracks owned by CSX Transportation

("CSX"). Monica Bauer Hesling ("Hesling") brought this wrongful death action as guardian and next

of friend of the decedent's two minor children. Hesling appeals the magistrate judge's denial of her

Rule 60(b) Motion for Relief from Judgment. Hesling also appeals the judgment, claiming several errors for exclusion of evidence, and improper or failure to give jury instructions. For the reasons that follow, we AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 25, 1996, Valentine was driving west along West Railroad Street in Long Beach, Harrison County, Mississippi, parallel to railroad tracks owned by CSX. Valentine turned south onto White Harbor Road and attempted to cross the tracks at the White Harbor Road crossing when a passenger train owned and operated by Amtrak, traveling 61 m.p.h., collided with Valentine's vehicle killing her and her husband.

Amtrak alleges that at the time of the collision, its train was equipped with the minimal safety devices required by state standards.[1] Amtrak also contends its train had its headlights on "bright," had its bell ringing, and sounded warning blasts for the crossing continuously from at least one-fourth mile prior to the White Harbor crossing, and continued to sound the horn at the time of the accident. The parties dispute the timing and length of the warning blast given by the Amtrak train. The crossing was marked with advance warning signs, advance pavement markings, a cross buck, and automatic flashers with lights and bells indicating the presence of a train, which were engaged at the time of the accident. At the time of the accident, the crossing was not equipped with gates or crossing arms. On May 11, 1994, two years prior to the accident, CSX was informed by the

_____

[1] Every railroad company shall cause each locomotive engine run by it to be provided with a bell of at least thirty (30) pounds weight and with a whistle or horn which can be heard distinctly at a distance of three hundred (300) yards, and shall cause the bell to be rung or the whistle or horn to be blown at the distance of at least three hundred (300) yards from the place where the railroad crosses over any public highway or municipal street. The bell shall be kept ringing continuously or the whistle or horn shall be kept blowing at repeated intervals until said crossing is passed. Miss. Code Ann. § 77-9-225 (1996).

2

Mississippi Department of Transportation that it was required to develop estimates for the installation of gates because a diagnostic survey team had determined that crossing gates were needed at the White Harbor Road crossing. Following the accident, federal funds were provided for the installation of crossing gates.

Immediately preceding the accident, the locomotive engineer of a stationary eastbound CSX train, located on a nearby side track adjacent to and just west of the White Harbor Road crossing to avoid the oncoming Amtrak train, stated that the decedent did not look in the direction of the westbound Amtrak train prior to the collision. The parties dispute whether Valentine was mislead into associating the activation of the crossing's warning lights with the stationary CSX train on the side track. Witnesses testified that the stationary CSX train was facing the crossing with its headlights on and smoke was emanating from its engine. Also, the parties dispute whether the decedent's view of the Amtrak train was obscured by a stopped northbound van on White Harbor Road that had just traversed the crossing and by a railroad structure/housing located on the northern part of the railroad just east and in close proximity to the White Harbor Road crossing.

On October 22, 1999, Hesling brought a wrongful death action in the United States District Court for the Southern District of Mississippi pursuant to 28 U.S.C. § 1332. Hesling alleged that CSX breached its duty in (1) maintaining an ultra-hazardous grade crossing at White Harbor Road; (2) failing to install automatic gates at the White Harbor Road crossing; (3) failing to protect the crossing by placing flagmen at the crossing until it was occupied by the Amtrak train; (4) failing to provide protection at the crossing in violation of Mississippi law and CSX Operating Rule 100-I; and (5) failing to exercise reasonable care under the circumstances then and there existing so as to avoid the subject accident. Hesling also alleged that Amtrak breached its duty in (1) operating its passenger

3

train at an excessive rate of speed; (2) operating its passenger train at a speed at which the train could not, in the exercise of reasonable care, be stopped at the grade crossing to avoid the subject accident; (3) failing to maintain a reasonable and proper lookout for motorists approaching and using the crossing; (4) failing to see the decedent's motor vehicle in sufficient time to avoid the subject accident; (5) failing to sound its whistle and ring its bell as the passenger train approached within 300 yards of said crossing in violation of Miss. Code Ann. § 77-9-225; and (6) in other ways failing to exercise reasonable care under the circumstances then and there existing so as to avoid the subject accident.

Discovery proceeded for approximately two and a half years. The jury trial began on January 21, 2003. The jury returned a verdict in favor of CSX and Amtrak on February 3, 2003. On February 18, 2003, Hesling moved for judgment as a matter of law, motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial under Federal Rule of Civil Procedure 59(a). The magistrate judge declined to disturb the jury's verdict. Hesling then filed a notice of appeal. Subsequently, two previously undisclosed CSX documents were discovered: (1) a CSX newsletter rating the Mississippi Gulf Coast corridor, which included the White Harbor Road crossing, as the most accident prone on the CSX system, and (2) an agreement between the City of Long Beach and CSX providing that CSX would not operate its trains faster than 45 m.p.h. through Long Beach. Based on this new discovery, Hesling made a motion for relief from judgment under three subsections of Federal Rule of Civil Procedure 60(b): 60(b)(2) based on newly discovered evidence; 60(b)(3) based upon fraud, misrepresentation, or other misconduct; and the "catch-all" subsection 60(b)(6) based upon extraordinary circumstances. The magistrate judge denied Hesling's 60(b) Motion for Relief. Hesling filed a timely amended notice of appeal.

4

DISCUSSION

I.    Preemption of the Excessive Train Speed Claim

Much of Hesling's arguments hinge on her challenge to the magistrate judge's ruling on federal preemption; therefore, we first address whether the Federal Railroad Safety Act ("FRSA") preempted Hesling's claim that Amtrak violated a self-imposed CSX speed limit of 60 m.p.h.[2]  A district court's preemption ruling is reviewed de novo.  Branson v. Greyhound Lines, Inc., 126 F.3d 747, 750 (5th Cir.  1980).

Under 49 C.F.R. § 213.9, the Federal Railroad Administration ("FRA") sets out maximum allowable speed limits for different classes of tracks.  The White Harbor Road crossing was on a section of track rated as Class 4.  A Class 4 track has a maximum allowable speed of 60 m.p.h. for freight trains and 80 m.p.h. for passenger trains.  Hesling contends that the magistrate judge prejudicially erred in finding that the issue of speed was preempted because, according to Hesling, the magistrate judge ignored statements in the Federal Register suggesting that track speed is distinguishable from train speed.  Hesling proffered to the magistrate judge excerpts from the Federal Register, which Hesling argues demonstrate that while the FRA set track speed limits, it did not intend to establish train speed limits.  Instead, according to Hesling's interpretation, train speed is left to the discretion of the railroads  once a track classification is established.  We disagree.

In CSX Transp., Inc. v. Easterwood, the plaintiff brought a wrongful death action claiming, inter alia, CSX was negligent for operating its trains at excessive speeds.  507 U.S. 658, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993).  The Supreme Court found that the FRSA expressly preempted the

---

[2] Amtrak is subject to CSX rules when operating on CSX tracks.

plaintiff's claims insofar as she asserted state tort claims based on excessive train speed. Id. at 675-76. The plaintiff in Easterwood conceded that the train was traveling less than the 60 m.p.h. maximum allowable speed based on its track classification. Id. at 673. Nonetheless, the plaintiff argued that the train breached a duty to operate its train at a moderate and safe rate of speed. The Court held that the track class designation not only set a ceiling for train speed but should be understood as "covering the subject matter of train speed;" in other words, § 213.9 substantially subsumes the relevant state law as to claims based on train speed. Id. at 675. Therefore, the Court found that under the FRSA, any state law claim based on a train's allegedly excessive speed is preempted by federal law. Id. at 676.

It is undisputed by the parties that the track at the White Harbor Road crossing was rated a Class 4 track and, therefore, passenger trains are designated as safe for operating on it up to 80 m.p.h. 49 C.F.R. § 213.9 (West 2004). It is also undisputed that the Amtrak train was traveling approximately 61 m.p.h at the time of the subject accident. If we were to accept Hesling's argument that track speed is distinguishable from train speed, the latter being discretionary, it would make the regulation in § 213 meaningless. Hesling quotes the Federal Register to bolster her claim that the FRSA only intended to set track speed, but left train speed within the discretion of the railroads. The Federal Register states, "Notwithstanding some of the language in Easterwood that a cursory reading may otherwise indicate, FRA has never assumed the task of setting train speed. Rather, the agency holds railroads responsible for minimizing the risk of derailment by properly maintaining track for the speed they set themselves." Track Safety Standards, 63 Fed. Reg. 33,992, 33,999 (June 22, 1998) (codified at 49 C.F.R. pt. 213). Although on its face the statement from the Federal Register supports Hesling's position, the meaning of the statement changes drastically when put back into

6

context. The next sentence is illustrious, it elucidates "[f]or example, if a railroad wants its freight trains to operate at 59 m.p.h. between two certain locations, it must maintain the tracks between those locations to Class 4 standards." Id. In other words, train speed is left to the discretion of railroads insofar as they can target what type of track designations they want to maintain. However, that is not to say that railroads can ignore federal regulations in setting their own train speeds, but rather, they have the information and ability to tailor their operations to the particular track designations they desire, and in that way they are the masters of their own universe.

Hesling also avers that "the railroad could have gone 5 miles an hour across that crossing or 80 miles an hour across that crossing. It was up to the Railroad, itself, to determine that, the only limitation being the class of track." That is essentially the same argument the plaintiff in Easterwood put forth by arguing that despite the maximum allowable speed, CSX had the discretion and duty to operate at a safer, and more moderate speed under the circumstances. Easterwood, 507 U.S. at 673. The Supreme Court rejected the argument, and held that the state tort law claims concerning speed were preempted. Id. at 675. The train here was going under the authorized track speed and any claims or arguments regarding excessive speed are preempted. To hold otherwise would contradict Easterwood and its progeny. Because Amtrak maintained its train speed well within the speed ratings promulgated by the FRA, the magistrate judge did not abuse his discretion in finding that Hesling's excessive speed claims are preempted by federal law.

II.     Discovery Abuses

Next, Hesling claims the district court erred in denying her Motion for Relief from Judgment pursuant to Rule 60(b) based on alleged discovery abuses committed by CSX.

7

Rule 60(b)(2) provides that a court may relieve a party from final judgment based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." FED. R. CIV. P. 60(b). Rule 60(b)(3) provides for relief based on "fraud . . . misrepresentation, or other misconduct of an adverse party," and Rule 60(b)(6) further provides for relief based on "any other reason justifying relief from the operation of the judgment." Id. The purpose of Rule 60(b) is to balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of all the facts. Seven Elves, Inc. v. Eskenazi, 635 F.2d 396, 401 (5th Cir. Jan. 1981). "[T]he decision to grant or deny relief under Rule 60(b) lies within the sound discretion of the district court and will be reversed only for abuse of that discretion." Edwards v. City of Houston, 78 F.3d 983, 995 (5th Cir. 1996) (en banc) (citations omitted). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Kennedy v. Texas Utils., 179 F.3d 258, 265 (5th Cir. 1999) (citation omitted).

Hesling contends two documents were fraudulently withheld during discovery. The first is a letter detailing a settlement agreement between CSX and the cities of Biloxi, Gulfport, Long Beach, Pass Christian, Bay St. Louis and Waveland. The correspondence, dated February 11, 1988, detailed a plan by which CSX agreed "for at least a period of one full calendar year from and after January 31, 1988, [CSX] will operate all of its trains at a speed not greater than 45 m.p.h." through the Mississippi Gulf Coast. The other document withheld was the April/May 1993 edition of an internal CSX newsletter called CSXToday. The newsletter contained two articles Hesling asserts are relevant; (1) "Look, Listen and Live" states "[t]he 68 miles along the [Mississippi Gulf] coast is the most accident-prone on the CSXT system," and (2) another article makes the twin observations that

8

the Mississippi Gulf Coast had the heaviest concentration of crossings on the whole system, and local ordinances in Mississippi and Florida forced CSX to operate its freight service at a slower speed through populated areas.

Neither document was produced during the discovery phase of the trial, despite, what Hesling argues, were interrogatories and discovery requests which plainly required the production of the withheld documents. Hesling's Second Request for Production of Documents to CSX asked for in relevant part:

> REQUEST NO. 4: Any and all correspondence between CSX and Long Beach, Mississippi and/or the State of Mississippi concerning the White Harbor Road Crossing.
>
> . . .
>
> REQUEST NO. 6: All documents or records regarding the White Harbor Road crossing including but not limited to all interoffice memorandums, letters and documents of any nature concerning this crossing.
>
> . . .
>
> REQUEST NO. 16: Copies of all special instructions for the division and track which would have been in effect for the CSX and Amtrak trains involved in the subject accident on the day in question. This should include but not be limited to copies of all train orders and track warrants and copies of all slow orders in effect on the day of the accident for this division and track.

(Appellant's R. Excerpt, tab 9.) Hesling also asserts that the withheld evidence should have been produced subject to Plaintiff's First Set of Interrogatories to Amtrak, or in the alternative subject to Plaintiff's Second Set of Interrogatories to CSX. The interrogatories read in relevant part:

> INTERROGATORY NO. 13: Identify the applicable speed limit for an Amtrak train on the subject track as of October 25, 1996.

(Appellant's R. Excerpt, tab 10.)

INTERROGATORY NO. 2: For each of the crossings in Exhibit 2, please provide the following information:

      A.     Average daily passenger train volume;

      B.     Average daily freight train volume (through trains and switching trains);

      C.     Maximum time table speed for passenger trains;

      D.     Maximum time table speed for freight trains;

      E.     Accident history;

      F.     Milepost;

      G.     Date of installation of active traffic control device; and

      H.     Who paid for the installation?

(Appellant's R. Excerpt, tab 11.)

A.     Relief under Rule 60(b)(2)

Under Rule 60(b)(2), "[t]o succeed on a motion for relief from judgment based on newly discovered evidence, our law provides that a movant must demonstrate: (1) that it exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment." Goldstein v. MCI Worldcom, 340 F.3d 238, 257 (5th Cir. 2003) (citation omitted). A judgment will not be reopened if the evidence is merely cumulative or impeaching and would not have changed the result. Trans Mississippi Corp. v. United States, 494 F.2d 770, 773 (5th Cir. 1974).

Hesling argues that despite due diligence on its part, CSX failed to produce the withheld documents and, but for this error, a different result would have emerged from trial. Specifically, Hesling contends that although the magistrate judge found the issue of train speed federally preempted, it did not address the argument of a "specific individual hazard," which is not preempted

10

by federal law.  Acco rding to Hesling, the 1988 agreement would have been evidence that CSX recognized such a hazard because it agreed to reduce the danger of operating at high speeds through Long Beach.  Because the documents would not be preempted, Hesling argues they would have clearly affected the outcome of the trial.

Section 20106 of the Federal Railroad Safety Act details its preemptive force.[3]  The provision declares that laws, rules, regulations, orders, and standards relating to railroad safety are substantially subsumed by federal law.  However, § 20106 allows states to adopt additional or more stringent state regulation related to railroad safety to prevent a local hazard, but only if the state law is not incompatible with federal regulation and does not burden interstate commerce.  49 U.S.C. § 20106; Easterwood, 507 U.S. at 662.  "The legislative history [of the FRSA] makes it abundantly clear that this savings clause is to be narrowly construed."  Easterwood v. CSX Transp., Inc., 933 F.2d 1548,

---

[3] 49  U.S.C. § 20106 provides:

Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order–
  (1) is necessary to eliminate or reduce an essentially local safety or security hazard;
  (2) is not incompatible with a law, regulation, or order of the United States Government;  and
  (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106 (2004) (original version at 45 U.S.C. § 434, Pub. L. 91-458, Title II, § 205 (1970)) (emphasis added).

11

1553 n.3 (11th Cir. 1991) (citing H. R. REP. NO. 1194 (1970), reprinted in 1970 U.S.C.C.A.N. 4104, 4117).

The Supreme Court in Easterwood, although finding that excessive speed claims are preempted, specifically declined to decide if § 20106 preempted related tort law duties like "the duty to slow or stop a train to avoid a specific, individual hazard." Easterwood, 507 U.S. at 675 n.15. The term specific, individual hazard means a "discrete and truly local hazard." Seyler v. Burlington N. Santa Fe Corp., 102 F. Supp. 2d 1226, 1236 (D. Kan. 2000) (citations omitted). It "relates to the avoidance of a specific collision." Armstrong v. Atchison, Topeka & Santa Fe Ry. Co., 844 F. Supp. 1152, 1153 (N.D. Tex. 1994). A condition that can be or is present at many, or most sites cannot be a specific, individual hazard. See, e.g., Earwood v. Norfolk S. Ry. Co., 845 F. Supp. 880, 888 (N.D. Ga. 1993); see also Bowman v. Norfolk S. Ry. Co., 832 F. Supp. 1014 (D.S.C. 1993). Most courts have rejected plaintiffs' claims of a specific, individual hazard, finding instead that the circumstances are preempted.[4]

The 1988 agreement applied to the rail system running through the entire Mississippi Gulf Coast. Hence, it is not an agreement to avoid a single, specific collision at any particular crossing, or in any particular municipality, and therefore the 1988 letter agreement is immaterial as evidence of a "specific individual hazard." Likewise, the CSX newsletter makes an observation about the track

---

[4] See Stuckey v. Illinois Cent. R.R. Co., 1998 WL 97270, at *5 (N.D. Miss. Feb. 10, 1998) (icy conditions on the roadway not a specific, individual hazard). See generally Seyler, 102 F. Supp. 2d at 1236 (for a listing of cases where the courts have found the circumstances preempted). But cf. Stone v. CSX Transp., Inc., 37 F. Supp.2d 789 (S.D. W.Va. 1999) (finding a local hazard because of terrain, short sight lines, repeated malfunctions of signal apparatus and no alternative routes); see Bakhuyzen v. Nat'l Rail Passenger Corp., 20 F. Supp. 2d 1113, 1118 (W.D. Mich. 1996) (poor visibility due to heavy snow constituted a specific, individual hazard).

12

speed and accident record of the _entire_ Mississippi Gulf Coast region. Accordingly, neither the 1988 letter agreement nor the CSX newsletter would fall under the "specific, individual hazard" exception, and thus, would not have clearly produced a different outcome at trial.

Hesling also claims that the withheld documents were material because a jury instruction included CSX's argument that the proper speed through Long Beach was 80 m.p.h. pursuant to federal law. According to Hesling, the documents, in that they show CSX exercising discretion in setting train speed in response to safety concerns, would have refuted the argument that the issue of train speed was preempted.

For the reasons we have already stated, the magistrate judge was correct in finding that the issue of train speed was preempted. The withheld documents dealt exclusively with train speed. Ignoring the fact that there is no evidence the 1988 agreement was applicable for more than "one full calendar year from and after January 31, 1988," even if CSX had agreed to an internal rule capping the speed of a train operating on its track at 45 m.p.h., internal speed regulations cannot overcome preemption. See Michael v. Norfolk S. Ry. Co., 74 F.3d 271, 273 (11th Cir. 1996) ("Violation of the railroad's own speed regulations may be evidence of negligence in a state tort claim for excessive speed; however, such a state tort claim is preempted by federal law, and the internal railroad regulations would be irrelevant under federal law"). Because the withheld documents would not have changed the preemption determination, they clearly would not have affected the ultimate case determination. Accordingly, we find that the magistrate judge did not err in denying Hesling's Motion for Relief from Judgment under 60(b)(2).

B.      Relief under Rule 60(b)(3)

Next, Hesling argues t hat CSX's failure to disclose the 1988 agreement and the CSX newsletter amounted to fraud and misconduct. A party making a Rule 60(b)(3) motion must establish

13

(1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting his case. Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, 62 F.3d 767, 772 (5th Cir. 1995) (quotations and citations omitted). The moving party has the burden of proving the misconduct by clear and convincing evidence. Rozier v. Ford Motor Co., 573 F.2d 1332, 1339 (5th Cir. 1978). Unlike Rule 60(b)(2), 60(b)(3) does not require that the information withheld be such that it can alter the outcome of the case. Id. Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." Id. The rule is remedial and should be liberally construed. Id. at 1346 (quotations and citation omitted). The magistrate judge held that Hesling was not prevented from fully and fairly presenting her case because even if the withheld documents had been available, the issue of speed was preempted.

In Rozier, this Court found that the plaintiff was prevented from fully and fairly presenting her case because, as a result of what was produced during discovery, the plaintiff decided not to assert certain theories of liability and de-emphasized others. Id. at 1342. The Court determined that if the fraudulently withheld documents had been produced, it would have changed the way plaintiff's counsel would have approached the case and prepared for trial. Id. Here, Hesling argues that if she received the withheld evidence, she "could have explored the issue of a 'specific individual hazard,'" "inquired further into the background of the speed argument," and "explore[d] the reasons for the installation of crossing gates after the subject accident." However, excessive train speed and the subsequent installation of crossing gates were arguments put before the court. The court found these issues to be inadmissible as a matter of law and excluded testimony or evidence on the matters. Furthermore, as previously discussed, the documents are irrelevant to the issue of "specific, individual

14

hazard." Therefore, the failure to produce the documents did not affect how Hesling's case was presented to the court. We need not reach the issue of whether CSX committed fraud or misconduct during discovery because we agree with the magistrate judge's finding that Hesling has not shown interference in her ability to present her case. Thus, the magistrate judge did not err in denying Hesling's Motion for Relief from Judgment pursuant to Rule 60(b)(3).

C.      Relief under Rule 60(b)(6)

Hesling also submits that relief under Rule 60(b)(6) was appropriate because CSX's counsel had actual knowledge of and involvement with the discovery that was withheld.[5] Under Rule 60(b)(6), a court may grant relief for "any other reason justifying relief from the operation of the judgment." FED. R. CIV. P. 60(b)(6). "Rule 60(b)(6) 'is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses.' 'The broad language of clause (6) gives the courts ample power to vacate judgments whenever such action is appropriate to accomplish justice.'" Harrell v. DCS Equip. Leasing Corp., 951 F.2d 1453, 1458 (5th Cir. 1992) (citations omitted). However, "[r]elief under this section is granted 'only if extraordinary circumstances are present.'" American Totalisator Co., Inc. v. Fair Grounds Corp., 3

---

[5] Raymond Brown, counsel for CSX in this action, signed and executed the 1988 agreement on behalf of CSX.

F.3d 810, 815 (5th Cir. 1993) (citation omitted).[6] The magistrate judge held that no extraordinary circumstances were presented in this case to warrant relief under Rule 60(b)(6).

This Court has consistently held that relief under 60(b)(6) is mutually exclusive from relief available under sections (1)-(5). Transit Cas. Co. v. Sec. Trust Co., 441 F.2d 788, 792 (5th Cir. 1971). The reason for relief set forth under 60(b)(6) cannot be the reason for relief sought under another subsection of 60(b). Hess v. Cockrell, 281 F.3d 212, 215 (5th Cir. 2002). Hesling cannot obtain relief under 60(b)(6) where the allegations of fraud or misconduct are essentially the identical grounds for relief sought under her 60(b)(3) motion. But even assuming arguendo that Hesling has managed to distinguish the grounds sought for relief under 60(b)(6) from those sought under 60(b)(3), she is still not entitled to relief. We deem CSX's explanation for not disclosing the documents–because Hesling did not specifically ask for them and because they are allegedly public documents–to be wholly unpersuasive and somewhat dubious in light of the clear language of the discovery documents and the nature of the lawsuit; however, because the resolution of this issue does not turn on a fraud determination, we will not dwell on this point further. Instead, we find that the

---

[6] See Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988) (granting 60(b)(6) motion where district court judge violated statute requiring him to disqualify himself from proceedings when his impartiality might be questioned); see also Klapprott v. United States, 335 U.S. 601, 69 S. Ct. 384, 93 L. Ed. 266 (1949) (finding extraordinary circumstances where petitioner had default judgment entered against him canceling his citizenship without evidence, a hearing, or counsel, at a time when the Government was then holding him in jail with no reasonable opportunity for him to defend his right to citizenship); see also Turner v. Salvatierra, 580 F.2d 199, 201 (5th Cir. 1978) (granting 60(b)(6) relief from default judgment against defendant where "plaintiffs' failure, in violation of Rule 55, to notify defendant of their default motion 'provides sufficient reason for [defendant's] failure to respond,' and because defendant claims that he has a meritorious defense by his denial").

magistrate judge did not abuse his discretion in holding that the facts here do not rise to the level of extraordinary circumstances justifying relief.

III.    Jury Instructions

Hesling makes several claims challenging the magistrate judge's rulings concerning proposed jury instructions.  Hesling argues the court committed prejudicial error by charging the jury on the matter of speed, by refusing to charge the jury regarding the ultra-hazardous nature of the crossing, by refusing to charge the jury on the duty of the Amtrak train to either slow its train or sound its emergency horn while maintaining a proper and reasonable lookout, and by refusing to give a spoliation charge based on Amtrak's failure to preserve the dispatcher tape made following the subject collision.

The district court's jury instructions are reviewed for abuse of discretion.  Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 494 (5th Cir. 2002); United States v. Morales-Palacios, 369 F.3d 442, 445 (5th Cir. 2004) (failure to grant jury instruction reviewed for abuse of discretion).  We have reviewed the record and the magistrate judge's memorandum orders and find no abuse of discretion.  Accordingly, we affirm the magistrate judge's rulings.

IV.    Exclusion of Evidence

Hesling also makes several challenges to the magistrate judge's rulings excluding: evidence of the installation of crossing gates subsequent to the subject accident; evidence that of prior accidents at the White Harbor Road crossing; accident reports from the White Harbor Road crossing; evidence the CSX crew violated CSX Operating Rule 55C at the time of subject accident; testimony of the Federal Rule of Civil Procedure 30(b)(6) designee for CSX; and testimony of the Amtrak

17

engineer conducting the train at the time of the subject accident. In addition, Hesling asserts that the magistrate judge erred in granting the Defendants' Motion in Limine To Prohibit Expert Testimony Regarding the Dangerous Conditions of the Crossing and the Motion in Limine on the Issue of the "Specific, Individual Hazard." The grant or denial of a motion in limine is considered discretionary, and thus will be reversed only for an abuse of discretion and a showing of prejudice. Buford v. Howe, 10 F.3d 1184, 1188 (5th Cir. 1994). We review exclusions of evidence for abuse of discretion. United States v. Sharpe, 193 F.3d 852, 867 (5th Cir. 1999). Having reviewed the magistrate judge's memorandum orders and the record in this case, we find that it was not an abuse of discretion for the magistrate judge to exclude the above mentioned evidence nor did the magistrate judge err in granting the defendants' motions in limine. However, whether the testimony of the Rule 30(b)(6) designee for CSX was properly excluded merits further discussion because it involves an issue of first impression in this Court.

Hesling contends that the magistrate judge prejudicially erred in excluding the testimony of Douglas Halpin, the Rule 30(b)(6) designee for CSX. Hesling submitted Halpin's testimony in furtherance of a negligence claim for inadequate signalization based on CSX's failure to install automatic crossing gates. Hesling proffered Halpin's testimony to demonstrate that CSX knew that the installation of crossing gates at White Harbor Road had been recommended by a diagnostic survey team in 1994–two years prior to the collision. The diagnostic team contacted CSX in 1994 to inform CSX that it was required to begin developing estimates for the project. This is significant because under 23 C.F.R. § 646.214(b)(3)(i), automatic gates must be installed once a diagnostic team recommends them, at any project where federal funds participate. There are no Fifth Circuit cases

18

that address whether the FRSA preempts negligence claims based on delay in the installation of warning devices subsequent to federal approval.

In a pretrial order, the magistrate judge concluded that the FRSA preempted any state tort claims based on the choice of, or installation of, warnings devices. The magistrate judge averred "that once federal funds have been used to improve crossings, including choice of signalization, the State's error, if any, in choice of such devices cannot be construed as negligence on the part of the railroad. Preemption attaches as so on as the federal moneys are spent and the devices are installed." CSX presented evidence that federal funds had at least partially participated in the installation of the warning devices at the White Harbor Road crossing. Thus, the court concluded that any claims concerning the adequacy of the warning devices at the White Harbor Road crossing were preempted by federal law. Accordingly, the magistrate judge held that any evidence going to the insufficiency of the signals at the White Harbor Road crossing was irrelevant and unduly prejudicial. The magistrate judge's preemption ruling did not specifically address whether negligence claims based on delay in the installation of signals was encompassed in his preemption determination.

In ruling at trial on whether Halpin's testimony should be excluded, the magistrate judge repeated his earlier preemption conclusion. The magistrate judge held that Halpin's testimony was only relevant as to a claim for inadequate signalization, thus, the magistrate judge excluded the testimony. When a trial court's evidentiary ruling is based solely on the resolution of a legal issue, our standard of review is de novo. Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1305-06 (5th Cir. 1991) (quotation marks and citation omitted). Therefore, it is necessary for us to review the magistrate judge's preemption ruling.

The Supreme Court has held that where § 646.214(b)(3) and (4)[7] are applicable, state tort law is preempted. Easterwood, 507 U.S. at 670. The Easterwood Court concluded that § 646.214(b)(3) and (4) displace state and private decision-making authority by establishing a federal law requirement that certain warning devices must be installed. Id. The crucial factor in determining whether § 646.214(b) is applicable, is whether federal funds participated in the installation of the warning devices at the crossing. "The fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary [of Transportation] approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task." Hester v. CSX Transp. Inc., 61 F.3d 382, 387 (5th Cir. 1995). Once federal funds, and concomitantly federal approval, are given for a crossing's warning system the "'financing of the improvement project and its direction and control' are removed from the railroad, and claims against the railroad relating to the adequacy of the warnings are preempted."

---

[7] (3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

. . . .

(F) A diagnostic team recommends them.

. . . .

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

23 C.F.R. § 646.214(b) (West 2004).

20

Armijo v. Atchison, Topeka and Santa Fe Ry. Co., 87 F.3d 1188, 1190 (10th Cir. 1996). In this case, CSX presented a Railroad Crossing Master Agreement that showed federal funds were provided in 1981 for the installation of the passive warning devices that were present at the White Harbor Road crossing at the time of the subject accident.[8]

The Supreme Court, in Norfolk S. Ry. Co. v. Shanklin, declared that it is the "displacement of state law concerning the devices' adequacy, and not the States' or the FHWA's adherence to the standard set out in § 646.214(b)(3) and (4) . . . that preempts state tort actions." 529 U.S. 344, 357-58, 120 S. Ct. 1467, 146 L. Ed. 2d 374 (2000). Although § 646.214(b)(3)(i)(F) required that automatic gates must be installed once the diagnostic team recommended them, it is the federal statute's mandate in § 646.214(b) that usurps state and private decision-making authority and indicates federal preemption.[9] We find that federal law covers the subject matter as to the installation of warning devices at railroad crossings. Therefore, we hold that negligence claims for delay in installation of warning devices are preempted by federal law.

_____

[8] Federal funds for the automatic crossing gates had not yet been received at the time of the subject accident, which CSX contends was the reason for the delay in installation.

[9] See Bryan v. Norfolk & W. Ry. Co., 154 F.3d 899, 904 (8th Cir. 1998) (holding that once federal funds are appropriated for warning devices, after the devices are installed and operating, state tort law is preempted regardless of subsequent approval of additional warning devices); see also Armijo v. Atchison, Topeka and Santa Fe Ry. Co., 87 F.3d 1188, 1192 (10th Cir. 1996) (rejecting the argument that "the subsequent decision (that an active warning system was needed . . .) somehow suspended the preemption of state law until federal funds participated in some significant way in the installation of the active warning devices. . . . The mere fact that the federal government has changed its opinion regarding what warning devices are needed at a particular crossing at some point after making a prior determination a lesser warning system is sufficient is of no real significance"). But see Powers v. CSX Transp., 97 F. Supp. 2d 1297, 1305 (S.D. Ala. 2000) (holding that while § 646.214(b)(3) and (4) preempted state tort claims for failure to install adequate warning devices, a negligence claim for failure to timely install warning devices following federal authorization was not preempted).

21

Here, Halpin's testimony was proffered by Hesling to prove the inadequacy of the signalizations at the subject crossing at the time of the accident and bolster the negligence claim. Since the warning devices at the White Harbor Road crossing were federally funded, and thus the FRSA was implicated, the magistrate judge correctly denied admission of any evidence to bolster a state tort claim that CSX was negligent for not timely installing warning devices upon federal approval. Therefore, the magistrate judge did not err in excluding Halpin's testimony.

## CONCLUSION

For the foregoing reasons, we conclude that the magistrate judge did not err in denying Hesling's 60(b) Motion for Relief from Judgment. We also conclude that the magistrate judge did not err in finding the Federal Railroad Safety Act preempted Hesling's negligence claims. Furthermore, we find that the magistrate judge did not err in refusing to give certain jury instructions or in the jury instruction given, nor did the magistrate judge err in his various evidentiary rulings. The court's judgment is therefore AFFIRMED.

AFFIRMED.