REVISED JUNE 15, 2009
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 7, 2009

Charles R. Fulbruge III
Clerk

No. 08-10227

Thermacor Process, L.P.

Plaintiff-Appellant

v.

BASF Corporation

Defendant-Appellee

Appeal from United States District Court
for the Northern District of Texas

Before GARWOOD, GARZA, and OWEN, Circuit Judges.

PER CURIAM:

Plaintiff-appellant, Thermacor Process, L.P. (Thermacor), sued defendant-appellee, BASF Corporation (BASF), alleging negligent misrepresentation, fraudulent inducement, and violations of the Texas Deceptive Trade Practices Act (DTPA), Tex. Bus. & Com. Code Ann. § 17.46(b)(5) & (7). The district court granted summary judgment for BASF on all claims and entered judgment against Thermacor on February 7, 2008. On March 4, 2008, Thermacor filed a Motion for Relief from Judgment pursuant to Rule 60(b)(2). On March 6, 2008, Thermacor filed its notice of appeal from the February 7, 2008 judgment. On March 19, 2008, the district court denied Thermacor's Rule 60(b) motion, and on March 20, 2008, Thermacor filed its notice of appeal from that denial.

Thermacor now challenges both the district court's grant of summary judgment and its denial of the Rule 60(b) motion. For the following reasons, we AFFIRM.

FACTS AND PROCEEDINGS BELOW

The summary judgment evidence reflects the following.

Thermacor manufactures pre-insulated piping systems for installation at commercial sites. One of Thermacor's products is steel piping that is installed for the distribution of high-temperature steam, condensate, and heated water. To insulate the pipe, Thermacor coats it with a foam insulation that is held in place and protected by a polyethylene outer jacket. There are two means by which Thermacor can insulate its piping systems: (1) an injection method, in which foam insulation is injected between the pipe and its polyethylene jacket, and (2) a more efficient "spray" method, in which foam insulation is sprayed on the pipe as it moves on a rotating conveyor and a polyethylene jacket is applied later. Thermacor initially used only the injection method, but in 2000, after purchasing a spray foam application system, Thermacor began using the spray method as well. The new system required a spray foam, and Thermacor was put in touch with BASF as a potential supplier. Thermacor began using BASF's low-temperature spray product after John Williams, a BASF sales representative, and Ron Patterson, a BASF process engineer, successfully tested the application of BASF's spray foam using Thermacor's spray equipment.

In 2004, the EPA banned (effective in January 2005) a blowing agent known as "HCFC 141b." Thermacor's high-temperature injecting foam contained HCFC 141b; thus, Thermacor was in urgent need of a new product to insulate its high-temperature steel piping. Thermacor hoped to replace the banned product with a high-temperature spray foam in order to increase efficiency; however, no such product existed at the time.

In mid-2004, Joe Keyes, Sr., Thermacor's CEO, asked BASF to pursue the

2

development of a high-temperature spray formula that could withstand continuous temperatures as high as 366 degrees and spikes of up to 400 degrees.[1] BASF developed the Elastopor H17070R Resin product (17070 product), which it believed met Thermacor's needs, and on June 17, 2004 sent an email to Joe Keyes, Jr., President of Thermacor, stating:

> "In my last conversation with [Keyes, Sr.], he indicated that BASF should pursue the Hi-Temp spray. It is done, please find tech data sheet attached. Please ask James Filer if one drum of Resin will be enough for the trial."

Attached to the email were data sheets pertaining to the 17070 product. The data sheets contained the results of two heat tests, a Dynamic Mechanical Analysis test and a Thermogravimetric Analysis test conducted by BASF's labs. These data sheets showed that the product softened at slightly over 390 degrees; they did not indicate the time-interval by which the temperature was increased during the test, and the data did not evidence end-use thermal stability. Each page of the data sheets pertained to the 17070 product, and stated that Thermacor "should thoroughly test any application, and independently determine satisfactory performance before commercialization." BASF also provided a PowerPoint presentation explaining that the graph showed the temperature at which the foam began to show "an onset of a softening transition" and that the values were dependent on the density of the foam.

Williams testified that he informed Thermacor representatives on several occasions that it was important to test the product, and Williams's call reports indicated he had made several attempts to schedule trial dates with Thermacor. Thermacor acknowledges that it has tested new high-temperature foam products in the past; however, Thermacor does not, as a general practice, test the

---

[1]All temperature variables reflect degrees Fahrenheit unless otherwise indicated.

3

products it purchases from other manufacturers. Keyes, Sr. also testified that Thermacor was told to test the product, and Thermacor did perform tests to determine how well the foam would perform under certain temperatures and whether the foam would apply properly to the pipe. Keyes, Sr. testified that Thermacor "could have been a little more critical" of the test results pertaining to temperature, which showed slight discoloration and charring at extreme temperatures.

Still, even with these results and the knowledge that the tests remained incomplete, Thermacor decided that the foam would be satisfactory for application in its insulated pipe system. Thermacor did not purchase the 17070 product, but instead, chose to go forward with a different product, the 17071 product, which was an unblended product that Thermacor had not yet tested.[2] The technical information and data sheets BASF provided to Thermacor about the 17071 product similarly warned Thermacor that it "should thoroughly test any application." Each of Thermacor's orders was accompanied by BASF's "Terms and Conditions," which provided:

> "ANY TECHNICAL ADVICE FURNISHED . . . IS BELIEVED TO BE RELIABLE BUT SELLER MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, . . . AS TO ITS ACCURACY OR COMPLETENESS OR OF THE RESULTS TO BE OBTAINED. . . . BUYER ASSUMES FULL RESPONSIBILITY FOR QUALITY CONTROL, TESTING AND DETERMINATION OF SUITABILITY OF PRODUCT FOR ITS INTENDED APPLICATION OR USE. . . . SELLER MAKES NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTY OF MERCHANTABILITY."

---

[2]The two products are slightly different. The 17070 product is a pre-blended product, while the 17071 product is unblended and required that Thermacor purchase a component from a third party and blend the product itself according to BASF's specifications.

At the time of the purchase at issue, BASF and Thermacor had enjoyed a long-lasting business relationship, and these same BASF Terms and Conditions had been included in many past transactions between them.

Thermacor manufactured several piping systems using the BASF high-temperature spray foam product and installed these systems in several locations. At one location a contractor noticed a soft spot on the pipe, and an investigation revealed that the BASF foam had deteriorated. Investigations at other sites revealed the BASF foam product was also failing within months. And during post-failure heat testing, Thermacor discovered that the spray foam failed at around 290 degrees.

Thermacor filed suit against BASF, alleging claims of negligent misrepresentation, fraudulent inducement, and violations of section 17.46(b)(5) & (7) of the DTPA. Summary judgment was granted for BASF as to all claims. Thermacor filed a Motion for Relief from Judgment pursuant to Rule 60(b)(2), which the district court denied. Thermacor now appeals both the summary judgment and the denial of the Rule 60(b) motion.

DISCUSSION

I.     Summary Judgment

This court reviews a district court's grant of summary judgment de novo. United States v. Corpus, 491 F.3d 205, 209 (5th Cir. 2007). Summary judgment is appropriate if the record, taken as a whole, "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); James v. Texas Collin County, 535 F.3d 365, 373 (5th Cir. 2008). "A factual dispute is 'genuine' if a reasonable trier of fact could return a verdict for the nonmoving party." James, 535 F.3d at 373. The nonmovant must designate specific facts that establish a genuine issue of material fact exists on all elements of its claims. Kunin v. Feoganov, 69 F.3d 59,

5

61 (5th Cir. 1995). All facts and inferences must be viewed in the light most favorable to the nonmovant. Corpus, 491 F.3d at 209.

Thermacor argues that the district court improperly granted BASF's motion for summary judgment on each of Thermacor's claims for negligent misrepresentation, fraudulent inducement, and violations of section 17.46(b)(5) & (7) under the DTPA. All claims share a common element—each requires Thermacor to prove that BASF made a false representation.[3] And all of Thermacor's claims turn on the same alleged misrepresentation, that BASF falsely represented it could and did develop a high-temperature spray foam capable of meeting Thermacor's thermal stability requirements. Thus, the central issue in this case is whether a rational trier of fact could find that BASF misrepresented its ability to develop such a product and/or falsely represented that it had developed such a product.

As evidence that BASF falsely represented its competence to produce a foam capable of meeting Thermacor's specifications, Thermacor points to BASF's internal policy not to refer to foam as "high-temperature," not to rate foam for temperature, and not to distribute test data to customers. These policies, however, do not evidence a misrepresentation of ability—if anything, they show a policy not to make representations regarding temperature at all. Nor do these policies show BASF was incapable of producing a foam that met Thermacor's specifications—e.g., they do not portray inexperience, lack of knowledge, or lack of expertise in foam formulation or production; they simply reinforce BASF's requirement that customers independently test products for end use. Thus,

---

[3]TEX. BUS. & COM. CODE §§ 17.46(b)(5) & (b)(7), 17.50(a)(1) (Vernon 2002); Haase v. Glazner, 62 S.W.3d 795, 798–99 (Tex. 2001) (fraudulent inducement); Doe v. Boys Clubs of Greater Dallas, 907 S.W.2d 472, 478 (Tex. 1995) (DTPA claims); Fed. Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991) (negligent misrepresentation).

6

Thermacor has provided no evidence that BASF falsely represented its ability to create the high-temperature spray foam Thermacor required.

Thermacor argues that a genuine issue of fact remains as to whether BASF falsely represented that it had successfully created such a product. To support its claim, Thermacor points to the above mentioned June 17, 2004 email sent by Williams (of BASF) to Keyes, Jr. along with accompanying graphs and data sheets. The email, which referenced BASF's creation of product 17070, read:

> "In my last conversation with [Keyes, Sr.], he indicated that [BASF] should pursue the Hi-Temp spray. It is done, please find tech data sheet attached. Please ask James Filer if one drum of Resin will be enough for the trial."

Thermacor argues that this email created a false representation that the product met Thermacor's temperature needs.

We find this argument unconvincing. The email makes no affirmative representation that the product was able to withstand continuous temperatures of 366 degrees and spikes up to 400 degrees. Instead, it indicates only that BASF pursued development of a high-temperature foam, believed it created a product capable of meeting Thermacor's needs, and then offered that product to test, as evidenced by the email's reference to a "trial." Moreover, even if the email could be read as representing that BASF was "done" developing a high-temperature foam, such representation would not be false. The only term used to qualify the product was "hi-temp," and deposition testimony reflects that a foam is considered "high-temperature" if it performs at temperatures above 250 degrees. Thus, the email could only guarantee viability at temperatures above 250 degrees, and Thermacor's post-failure heat testing confirmed that the foam was able to withstand continuous temperatures as high as 290 degrees. Given this information, the email alone cannot be construed as false or as an

7

affirmative representation that the product met Thermacor's exact thermal stability requirements.

Still, Thermacor argues that the data sheets accompanying the email created a false representation. Thermacor does not allege that the data sheets themselves are inaccurate, but instead, that the data, when read in conjunction with the email, caused Thermacor to draw a false inference that the product could withstand higher temperatures than actually possible. For example, the Dynamic Mechanical Analysis test (DMA) showed that product 17070 began to deteriorate at approximately 390 degrees, and Thermacor argues that BASF failed to inform Thermacor that this data was not a reliable indicator of thermal stability. As another example, Thermacor complains that the DMA's testing parameters were altered, causing the product to appear more stable than it actually was, but BASF failed to inform BASF sales personnel and Thermacor of this change and its possible effects on the reliability of the data.

In deposition testimony, a BASF lab technician admitted that the heat tests' parameters were changed to raise the temperature from 1°C per minute to 5°C per minute. The data sheets did not indicate what time interval was used to conduct the test, and BASF admits it did not communicate the change to its sales personnel or Thermacor. Regardless, Thermacor has provided no evidence of what effect the changed intervals might have had on the data. Nor is there any evidence that Thermacor had reason to believe a certain time interval was used or that failure to tell BASF's sales personnel resulted in any kind of misrepresentation—BASF sales personnel were aware the results did not represent end-use suitability regardless of the parameters used.

The record also shows that BASF repeatedly warned Thermacor that the data sheets were not a reliable indicator of thermal stability. BASF provided Thermacor with a PowerPoint presentation explaining that the data sheets

8

showed only at what temperature the foam began to soften or transition and that such values were dependent upon the density of the foam. Thus, the data sheets could evidence nothing more than the temperature at which the product certainly could not be used.

The record shows that Thermacor was continuously warned, orally and in writing, that independent testing was necessary to ensure the foam met Thermacor's own individual specifications. BASF's internal records show that Williams (of BASF) repeatedly asked Thermacor to conduct tests; Patterson (of BASF) told Thermacor specific temperatures at which to conduct those tests; and the email itself references the need to conduct a "trial." Keyes, Sr., the Thermacor CEO, even testified that Thermacor was told to test the product for end-use suitability, and Thermacor did test the 17070 product for temperature, but chose to purchase the 17071 product prior to the conclusion of those tests,[4] even in the midst of less than satisfactory results.[5]

Though BASF was aware that Thermacor required a foam capable of withstanding a continuous 366 degrees, there is simply no evidence that BASF ever represented that was what it had created. No deposition testimony provides specific details as to dates, times, or content of statements made by BASF representatives that the foam was able to withstand continuous exposure

---

[4]Thermacor's case is further weakened by the fact that the email, data sheets and references regarding a high-temperature spray foam were made in relation to product 17070 and not product 17071. Product 17071 is an unblended, incomplete compound, requiring the purchase and mixture of an additional component. BASF argues that Thermacor purchased an inadequate and cheaper component than that contained in product 17070 and also poorly mixed that component with the 17071 product. BASF does not heavily rely on this argument and this court need not address it because the email and data fail to demonstrate an affirmative false representation.

[5]Keyes Sr. testified that Thermacor "could have been a little more critical" of its test results, which showed slight discoloration and charring at extreme temperatures.

to temperatures as high as 366 degrees—or at any temperature for that matter. Richard Bender, the Senior Vice President of Thermacor, testified that he believed BASF had produced a 360 degree foam after "[Williams said] we have done it. We've got the high-temperature foam. Something to that effect." Bender further explained that the data sheets "clearly showed, in [his] opinion, that the material would withstand 366 degrees continuous," though he admitted Williams had not affirmatively stated it could do so: "can I say that [Williams] said, I have a 366-degree foam? I can't say that." Keyes, Sr., testified that he believed BASF's product met Thermacor's specifications based upon the data sheets and comments that BASF had a "high-temp foam." But as mentioned previously, the term "high-temperature" is used to identify foams capable of withstanding temperatures as low as 250 degrees, and vague statements and adjectives like "high" are not actionable. See, e.g., Prudential, 896 S.W.2d at 163 (explaining that vague adjectives are not specific enough to qualify as a representation). Based upon the record, it was Thermacor's misinterpretation of the information, rather than any misrepresentations by BASF, that led Thermacor to believe that BASF had created a foam capable of meeting its requirements. In any event, the summary judgment evidence is not sufficient to sustain a finding that BASF falsely represented its product to Thermacor.

Further weakening Thermacor's case is the existence of a disclaimer in BASF's "Terms and Conditions" furnished to Thermacor. BASF alleges that this disclaimer bars all of Thermacor's claims. The disclaimer read in all capital letters and bold font:

> "ANY TECHNICAL ADVICE FURNISHED . . . IS BELIEVED TO BE RELIABLE BUT SELLER MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, . . . AS TO ITS ACCURACY OR COMPLETENESS OR OF THE RESULTS TO BE OBTAINED. . . . BUYER ASSUMES FULL RESPONSIBILITY

FOR QUALITY CONTROL, TESTING AND DETERMINATION OF SUITABILITY OF PRODUCT FOR ITS INTENDED APPLICATION OR USE. . . . SELLER MAKES NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTY OF MERCHANTABILITY."

The trial court gave effect to the above Terms and Conditions.

Under Texas law, a disclaimer of warranty can bar negligent misrepresentation, fraud, and DTPA claims. Prudential Ins. Co. of Am. v. Jefferson Assocs., 896 S.W.2d 156, 161 (Tex. 1995) (fraud and DTPA claims); Coastal Bank SSB v. Chase Bank of Tex., N.A., 135 S.W.3d 840, 843–44 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (negligent misrepresentation). To be effective, the disclaimer must be conspicuous and in writing. TEX. BUS. & COM. CODE ANN. § 2.316 (Vernon 2002). A term is conspicuous when it is written so that "a reasonable person against whom it is to operate ought to have noticed it." Id. § 1.201(10). For example, language in the body of a form is conspicuous if it is "in larger type than the surrounding text, or in contrasting type, font, or color." Id. A federal district court in the Northern District of Texas held that a similar BASF disclaimer appearing in the "Terms and Conditions" accompanying a purchase order was conspicuous and enforceable because the disclaimer was written all in bold, capital letters and was undoubtedly written so that a reasonable person would have noticed it. Alcan Alum. Corp. v. BASF Corp., 133 F. Supp. 2d 482, 498 (N.D. Tex. 2001).

Like the "Terms and Conditions" in Alcan, the present disclaimer was conspicuous—written in all capital letters and in bold type. Thermacor and BASF had a long-standing professional relationship, thus, the disclaimer not only accompanied the purchase order for the 17071 product, but had also been included with Thermacor's prior purchases of BASF products. Both parties were sophisticated and aware of the terms and conditions. Further, BASF made no

11

false representations regarding the product and made several oral requests to Thermacor that Thermacor test the product. Based upon all of the above, this Court sees no reason why the Terms and Conditions should not be given effect.[6]

Viewing the evidence in the light most favorable to Thermacor, there is no summary judgment evidence sufficient to sustain a finding that BASF falsely represented its product to Thermacor. The June 17, 2004 email made no representations as to specific temperature properties, the data sheets did not provide false information, and Thermacor was repeatedly told by BASF to test the product for end-use suitability. Also, the disclaimer contained in the Terms and Conditions negates causation by disclaiming reliance on any alleged representation about the product's end-use suitability. Thus, the district court properly granted BASF summary judgment as to all of Thermacor's claims.

## II. Rule 60(b) Motion

Thermacor filed a Rule 60(b) motion on March 4, 2008 and perfected its appeal from the February 7, 2008 judgment on March 6, 2008. Though a perfected appeal divests the district court of jurisdiction, the district court may still consider and deny a Rule 60(b) motion. Shepherd v. Int'l Paper Co., 372 F.3d 326, 329 (5th Cir. 2004) (requiring a district court to seek leave from the appellate court if it wishes to grant the motion). The district court's denial of Thermacor's request for relief under Rule 60(b)(2) for "newly discovered

---

[6]Compare Prudential, 896 S.W.2d at 162–63 (giving force to an "as is" clause that was not a boiler-plate provision, was a part of the basis of the bargain, was freely negotiated by similarly sophisticated parties and after finding no evidence that the defendant made false representations to the plaintiff regarding the property purchased) with Kane v. Nxcess Motorcars, Inc., 2005 Tex. App. LEXIS 1692 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (unpublished)) (refusing to enforce an "as is" provision after a dealer made knowing misrepresentations during the negotiations, the clause was neither discussed, seen, nor read during negotiations, and the purchaser was not a sophisticated party).

12

evidence" is reviewed under an abuse of discretion standard. Crutcher v. Aetna Life Ins. Co., 746 F.2d 1076, 1082 (5th Cir. 1984).[7]

Rule 60(b)(2) provides that a court may relieve a party from final judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." FED. R. CIV. P. 60(b). To obtain Rule 60(b)(2) relief, a movant must demonstrate: "(1) that it exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment." Hesling v. CSX Transportation, Inc., 396 F.3d 632, 639 (5th Cir. 2005). "A judgment will not be reopened if the evidence is merely cumulative or impeaching and would not have changed the result." Id. at 640.

In its Rule 60(b) motion, Thermacor offered, as new evidence, deposition testimony by Chris LaCarte, a BASF representative with knowledge of research, development, and marketing high-temperature foam products. LaCarte's deposition was taken on February 6, 2008, the day before the summary judgment ruling. Thermacor's deadline for filing a Rule 59(b) motion was February 22, 2008. Thermacor argues, however, that it was unable to move for a new trial at that time because it did not receive a transcript of the deposition (to attach as evidence to the motion) until February 28, 2008. Thermacor has offered no evidence that it acted with due diligence to obtain the transcript prior to February 22nd, nor has any evidence been provided that LaCarte's deposition could not have been obtained prior to responding to BASF's summary judgment

---

[7]Thermacor argues that this court should apply a lesser standard—allowing "even a slight abuse [to] justify reversal." See Seven Elves, Inc. v. Eskenazi, 635 F.2d 396, 402 (5th Cir. 1981). This court has clarified that the lesser abuse standard used in Seven Elves only applies to judgments not rendered on the merits and does not apply to summary judgments. Halicki v. La. Casino Cruises, Inc., 151 F.3d 465, 471 (5th Cir. 1998).

motion.  Nor did Thermacor ever move to postpone summary judgment response (or ruling) until after transcription of the deposition.

Moreover, LaCarte's testimony provides nothing more than impeachment evidence, which generally does not support relief from judgment. See Hesling, 396 F.3d at 639–40.  Lacarte testified that he was not involved in formulation, design, testing, or communication with any of BASF employees regarding the high-temperature spray foam at issue.  This testimony does nothing more than contradict the testimony of Williams and Patterson, who testified that LaCarte had been involved in formulating and rating the product.  It provides no evidence as to what BASF represented to Thermacor, what Thermacor relied upon, or how Thermacor met its obligation to test end-use suitability.  Based upon LaCarte's own testimony that he was not involved with the product or the transaction with Thermacor, the district court did not abuse its discretion by denying the motion after  determining the evidence was immaterial.

CONCLUSION

Thermacor failed to provide evidence to create a genuine fact issue as to whether BASF falsely represented its product, thus summary judgment was properly granted.  Thermacor was also unable to show that the evidence offered to support its Rule 60(b) motion was material and could not have been obtained earlier with due diligence, thus the motion was properly denied.

AFFIRMED